171 N.J. Super. 109 (1979)
407 A.2d 1290
JORGE ORTIZ, PLAINTIFF,
v.
FARRELL CO., DIVISION OF U.S.M. CORPORATION, ET AL., DEFENDANTS.
B.J. MARTIN CO., INC., THIRD-PARTY PLAINTIFF,
v.
CHEM-OIL CORP. AND ULTRA-POLY CORPORATION, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Law Division, Essex County.
Decided October 22, 1979.
*111 Mr. Frank Tunnero for plaintiff (Messrs. Blume & Weiseman, attorneys).
Mr. Thomas Aljian for defendants.
Mr. James Vasios for third-party plaintiff (Messrs. Conway, Reiseman, Baumgardner, Hurley & Kleinfeld, attorneys).
Ms. Edith K. Payne for defendant and third-party defendant (Messrs. Stryker, Tams & Dill, attorneys).
LANDAU, J.S.C.
This is a motion for summary judgment against plaintiff, third-party plaintiff and all cross-claimants, brought by Chem-Oil Equipment Corp., defendant and third-party defendant in a multi-party products liability case. It arises out of an industrial employee's accident on a used, modified machine and requires determination of the previously untested strict liability exposure of a used machinery broker in the following factual circumstances.
Jorge Ortiz was injured in 1977 by the blades of a plastic pelletizer[1] he operated at Ultra-Poly when it accidently started while he was cleaning its chamber through an unprotected porthole.
The machine cuts pellets from thermoplastic material extruded into a chamber through which water flows. It was manufactured *112 by defendant Farrell Co. for defendant Dow Chemical as a prototype to Dow's specifications, designed as a component in a system of several machines. Dow bought the pelletizer in 1964, and in 1965 placed a guard and safety interlock over one of its two portholes, the second being inaccessible as set up in the Dow plant.
In 1968 Dow notified Chem-Oil, a machinery broker, that the machine was "surplus." Pursuant to their written agreement, Chem-Oil sought and found an acceptable purchaser, defendant Glopak Corp. Under this Dow/Chem-Oil agreement, sales were to be "as is" and Dow was to retain title until Chem-Oil received payment from a purchaser. There is no indication in the moving papers, however, that the sale to Glopak was made on "as is" terms.
Pursuant to their agreement, Dow approved the sale and after it was consummated Chem-Oil kept 20% and turned over to Dow 80% of the selling price.
Although movant characterizes its role in Dow's machine disposal process as only that of a passive broker, the terms of its agreement with Dow provided in part:

Dow makes no warranty of any kind, either expressed or implied, as to the condition, safety, use or performance of any item, or items, designated as surplus and offered to Chem-Oil for sale. Chem-Oil does hereby assume any and all responsibility and liability in connection with or arising out of the handling of the items by Chem-Oil or the sale thereof after designation thereof as surplus and acceptance by Chem-Oil.
Glopak, a New Jersey used machinery dealer, took delivery in 1969 after inspecting the pelletizer at the Dow site. When delivered, it lacked either pelletizing blades or a motor drive so that it was inoperable without rework, which Chem-Oil did not and could not do.
Defendants Barbara Martin, Harold Martin and Reuben Hewter were principals of Glopak and of defendant, third-party plaintiff B.J. Martin Company. The machinery dealer ultimately sold the pelletizer to Ultra-Poly in 1975, but did not install, refurbish, retool or modify the machine.
*113 Ultra-Poly hired defendant John Coburn to install the pelletizer and make it operable. Various changes were made in the machine, but no further safety work was done on the portholes, so that one remained unprotected and accessible to Ortiz when he was injured.
No opposing briefs or affidavits were filed. The motion was opposed by plaintiff and the other parties, except for Dow, which took no position.
Chem-Oil says the undisputed facts preclude its liability in that:
(1) although in the chain of distribution, it was only a broker, with no sophistication in machinery design, exercising no control over the pelletizer, its manufacture or repair;
(2) the machinery was inoperable when sold to a knowledgeable machinery dealer and when thereafter resold by the dealer to plaintiff's employer; who could be expected to and did make changes in the machine, and that each of the subsequent purchasers had the control and expertise to cause necessary safety modifications to be made and could be expected to do so;
(3) Chem-Oil was not relied on by subsequent purchasers in the same manner as a seller engaged in the business of selling such a product so that the unequal bargaining power assumed in § 402A(1)(a) of the Restatement of Torts 2nd is not present;
(4) Chem-Oil had no duty to warn of any defect because there were knowledgeable intervening parties and the danger was obvious.
Chem-Oil also urges that it has no express or implied warranty liability. There was no express warranty given on its sale to Glopak and there was no sale made by Chem-Oil to Utra-Poly or plaintiff. Accordingly, the appropriate consideration here is that of strict liability. Realmuto v. Straub Motors, 65 N.J. 336 (1974); Heavner v. Uniroyal, Inc., 63 N.J. 130 (1973).
We turn first to Chem-Oil's contention that it exercised no control over the pelletizer at any time, as required in order to sustain liability under Scanlon v. General Motors Corp., 65 N.J. 582 (1974), and Lyons v. Premo Pharmaceutical Labs., 170 N.J. Super. 183 (App.Div. 1979). This argument ignores Chem-Oil's *114 assumption of liability for Dow in connection with the machinery sale. Such a hold-harmless provision between Dow and Chem-Oil also significantly expands the limits dictated by good sense, fairness and justice within which Chem-Oil may be held to a duty of strict liability.
The initial fixing of the existence of that duty is for the court. Suter v. San Angelo, 81 N.J. 150 (1979). The entry by Chem-Oil into a far-reaching undertaking of responsibility precludes my finding on a summary judgment motion that it was such a passive participant in the chain of distribution that it cannot be charged with control opportunity and duty emanating therefrom.
This conclusion compels consideration of movants' other arguments.
There is little doubt from the record that Glopak and its affiliates had the requisite expertise and opportunity to cause modifications to be made, as did Ultra-Poly, plaintiff's employer. Indeed, Ultra-Poly arranged for Coburn to modify the pelletizer and make it ready for operation. The record also may be deemed to show, however, for purposes of this motion, that Dow recognized the safety hazard by placing an interlock device on the only porthole which was exposed to workers in its plant. Thus, Chem-Oil, chargeable with Dow's knowledge through its undertaking, could be deemed aware of the safety defect existing when the used machine was placed in the stream of commerce.
In Suter, supra the court summarized strict liability, indicating that if at the time the seller distributes a product it is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes, so that users or persons expected to come in contact with the product are injured as a result, the seller shall be responsible for ensuing damages.
Considering that Cepeda also involved a pelletizer accident sustained in the absence of an interlock device, there is *115 sufficient showing of defect for this motion. Suter, supra, teaches that it is not necessary to show that a defendant created a defect, but only that the defect existed when the product was distributed by and under a defendant's control. Vendors of used products may also be held to strict liability account. Realmuto, supra.
Chem-Oil argues, however, that it should be insulated from liability by reason of the sale to subsequent knowledgeable purchasers. It has been held that even where the custom of the trade is for safety devices to be installed by an ultimate purchaser, if a machine could be operated without such device, the mere expectation that someone else will install it does not automatically immunize a manufacturer. Bexiga v. Havir Mfg. Co., 60 N.J. 402 (1972). It is true that in the Third Circuit case of Lockett v. General Electric Co., 376 F. Supp. 1201 (E.D.Pa. 1974), aff'd 511 F.2d 1394 (3 Cir.1975), after a full and complete trial the court concluded that the employer was in a better position than the supplier to provide safety protection. The record is insufficient on this motion to support such a finding. In light of the known defect pre-existing disposition to Glopak, summary judgment for Chem-Oil is not warranted on this state of the record based upon the capabilities of subsequent owners. The moving papers do not preclude a risk-utility analysis[2] result unfavorable to movant among possible strict liability defendants, carrying with it at least a duty to warn of the defect.
Although not treated extensively, Chem-Oil's brief also raised the important issue whether the policy of Restatement, Torts, § 402A(1)(a) is applicable to this transaction. Comments (c) and (f) to § 402A emphasize the special responsibility assumed by sellers by reason of what has been referred to as the "forced reliance"[3] of users upon the sellers skills.
*116 The Restatement view limits strict liability to persons "engaged in the business of selling such a product." Analogizing the basis for liability to the Commercial Code theory which imposes greater responsibilities upon sellers who are "merchants," Restatement commentators conclude that sales out of the usual course of business are not intended to fall within § 402A liability. Although § 402A concepts played an important role in the development of strict liability law in this State, our courts have not hesitated to go beyond its language.[4] Here, the moving papers do not rule out the status of Chem-Oil as an entity engaged in the business of selling used machinery. It even appears likely that it might be so considered, upon a more complete record. Moreover, although the "forced reliance" concept has considerable currency as a rationale for strict liability, the fundamental inquiry is for the existence of a duty, which involves analysis of all risk-utility factors. Risk-spreading factors may also form part of such an analysis in a case deemed appropriate by a trial judge, within the guidelines laid down in Cepeda and Suter, both supra.
This case is unusual in that Dow made a sale, probably out of the ordinary course of its business, through Chem-Oil, which acted within its ordinary course of business, and also assumed Dow's liability. Cases such as Bruce v. Martin-Marietta Corp., 544 F.2d 442, 449 (10 Cir.1976), and Ikerd v. Lapworth, 435 F.2d 197 (7 Cir.1970), are not truly analogous because they do not involve prior knowledge of defect, nor hybrid broker-seller parties.
On the meager record present respecting whether Chem-Oil should be deemed to be in the business of selling machines, there is certainly no basis for me to determine it should not.
The fourth basis urged for summary judgment is that of an absence of duty to warn, under the related concepts of liability of Restatement, Torts 2d, § 338, § 388 imposes duties upon direct or indirect suppliers of chattels which are likely to be dangerous *117 to users. Chem-Oil's argument is supplemented by its contention that the pelletizer was expected to undergo "further processing or substantial change" within the meaning of comment (p) to § 402A. In the § 388 argument Chem-Oil urges that the experienced used-machinery dealer and plaintiff's employer were both in a superior position to recognize the machine's defect and to correct it. Bolstered by the express comment (p) disclaimer of the Restatement as to products which are expected to undergo substantial change, Chem-Oil urges that it was known at the time of the sale by Chem-Oil that the machine was inoperable and required rework.
"Substantial change" or "further processing" rationale deals principally with material changes in the state of the product. Here, the accident arose out of a nonchanged aspect of the machine, it's unprotected porthole. Changes to other features had no material effect upon its potential for danger. The related questions posed by § 388(b) and § 402A(b) are whether Chem-Oil would reasonably expect that the machine would undergo intervening porthole safety corrections prior to use, and whether those for whose use it was supplied would realize its dangerous condition, if no corrections were made.
Considering the present state of the record, Suter's pronouncement precludes award of summary judgment on the latter theory against plaintiff, the operator in an industrial accident case. Would it be expected that the machine would undergo safety correction? There is nothing in the moving papers to support defendant's basis for the expectation, other than the skill and knowledge of the subsequent purchasers, a subjective determination not compelled by this record on summary judgment motion. Perhaps such expectation might be justified in many cases if suitable warning is given upon sale or transfer. Cf. Jackson v. N.J. Mfrs. Ins. Co., 166 N.J. Super. 448, 465 (App.Div. 1979).
I am unable to conclude that there are no genuine issues as to material facts. Accordingly, the motion for summary judgment is denied.
NOTES
[1] Coincidentally, a pelletizer was also the subject of Cepeda v. Cumberland Engineering, 76 N.J. 152 (1978).
[2] As more fully discussed in Cepeda, supra, 76 N.J. at 174.
[3] See, e.g., Bruce v. Martin-Marietta Corp., 544 F.2d 442, 449 (10 Cir.1976).
[4] The recent opinion in Suter, supra, is an example.