A.L. CRANDELL, Plaintiff and Appellant,

v.

LARKIN AND JONES APPLIANCE COMPANY, INC., a corporation, Defendant and Third Party Plaintiff/Appellee,

v.

GAMBLE–SKOGMO, INC., a Delaware Corporation, and Webster City Products Company, a Division of White Consolidated Industries, Inc., f/k/a Franklin Manufacturing Company, Third Party Defendants.

No. 13942.

Supreme Court of South Dakota.

Argued March 21, 1983.

Decided May 18, 1983.

Donald A. Porter of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, for plaintiff and appellant.

J. Crisman Palmer of Gunderson & Palmer, Rapid City, for defendant and third party plaintiff/appellee.

DUNN, Justice.

This is an appeal from a judgment entered by the trial court granting a motion to dismiss a products liability action against a commercial seller of used products. We reverse and remand.

On February 4, 1978, Gloria (Mrs. A.L.) Crandell (appellant) purchased a used Coronado clothes dryer from Larkin and Jones Appliance Company, Inc. (appellee). The dryer, which was displayed on appellee's sales floor, had a tag affixed to it which described the machine as "Larkin and Jones Quality Reconditioned Unit" which was "Tag-Tested" and "Guaranteed." In addition to these written representations, the salesman assured appellant that the dryer carried a ninety-day guarantee for "workmanship, parts and labor." Appellant purchased the dryer because of the guarantee and the $100 price tag. Appellee apparently delivered and installed the dryer that same day.

Late in the afternoon of February 18, 1978, appellant asked her son to put a blanket in the dryer to dry. Fifteen to twenty minutes later appellant noticed smoke coming through the furnace vents in her bedroom. Appellant ran to the utility room in the basement and saw the room was full of smoke, apparently coming from the dryer. Appellant opened the dryer door with wet towels because flames were coming out the front. Appellant's attempt to smother the flames in the drum with the wet towels was unsuccessful. Appellant then called the fire department. By the time of their arrival, the fire had spread to other areas of the utility room and had also caused significant smoke damage throughout appellant's home. Total damages to appellant's property as a result of the fire were in excess of $25,000.

Several days prior to the fire, appellant noticed the dryer had apparently overheated a load of clothing. To compensate for this, appellant put the heat selector dial on a lower setting and continued to use the dryer. According to appellant, the thought of a fire did not even occur to her.

Fire department personnel testified the sole ignition source of the fire was inside the dryer. Other expert testimony established that the fire originated in the dryer when the blanket being dried became so hot that it ignited.

None of the theories for recovery which were presented to the trial court were accepted. Appellant now appeals, contending the trial court erred in not finding appellee strictly liable and in not finding that appellee breached express and implied warranties. We address each contention in turn.

We adopted the strict liability theory, as set forth in Restatement of Torts (Second) § 402A, in *Engberg v. Ford Motor Company,* 87 S.D. 196, 205 N.W.2d 104 (1973), and thereby created a new cause of action in tort. Restatement of Torts (Second) 402A neither expressly includes nor excludes commercial sellers of used products from its coverage. Rather, its coverage applies to "one who sells any product." We have not determined whether the strict liability doctrine should be broadened to cover the commercial sale of used products. We now undertake that inquiry.

Courts[1] and commentators[2] disagree as to whether strict liability should apply to a commercial seller of used products. Courts rejecting strict liability for used products have primarily dealt with fact patterns which did not involve guarantees or reconditioned, rebuilt, or recapped products. In *Rix v. Reeves,* 23 Ariz.App. 243, 245, 532 P.2d 185, 187 (1975), a case involving the sale of a used wheel, the court specifically limited its holding when it stated: "By used products we do not refer to products rebuilt by a manufacturer, nor do we mean to imply that there is never any liability when used products are sold."

More recently the Oregon Supreme Court in *Tillman v. Vance Equipment Co.,* 286 Or. 747, 596 P.2d 1299 (1979), came to the same conclusion in a case involving the sale of a used crane "as is" which was inspected and approved by the purchaser. There, the court was reluctant to hold every commercial used-goods dealer responsible for injuries caused by defects in its goods. The court stated:

> We conclude that holding every dealer in used goods responsible regardless of fault for injuries caused by defects in his goods would not only affect the prices of used goods; it would work a significant change in the very nature of used goods markets. Those markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. *If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it* (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion). The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.
>
> We are of the opinion that the sale of a used product, *without more,* may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce.

286 Or. at 755–56, 596 P.2d at 1303–04 (emphasis added, footnote omitted).

1. For decisions holding sellers of used products strictly liable, *see, e.g., Peterson v. Lou Backrodt Chevrolet Co.,* 17 Ill.App.3d 690, 307 N.E.2d 729 (1974) *rev'd,* 61 Ill.2d 17, 329 N.E.2d 785 (1975); *Ortiz v. Farrell Co., Div. of U.S.M. Corp.,* 171 N.J.Super. 109, 407 A.2d 1290 (1979); *Turner v. International Harvester Company,* 133 N.J.Super. 277, 336 A.2d 62 (Law Div.1975); *Hovenden v. Tenbush,* 529 S.W.2d 302 (Tex.Civ.App.1975). For decisions refusing to hold sellers of used products strictly liable *see, e.g., Rix v. Reeves,* 23 Ariz.App. 243, 532 P.2d 185 (1975); *LaRosa v. Superior Court, Santa Clara County,* 122 Cal.App.3d 741, 176 Cal.Rptr. 224 (1981); *Tauber-Arons, Etc. v. Superior Court, Etc.,* 101 Cal.App.3d 268, 161 Cal. Rptr. 789 (1980); *Masker v. Smith,* 405 So.2d 432 (Fla.App.1981); *Peterson v. Lou Bachrodt Chevrolet Co.,* 61 Ill.2d 17, 329 N.E.2d 785 (1975); *Tillman v. Vance Equipment Co.,* 286 Or. 747, 596 P.2d 1299 (1979).

2. *Cf.* Note, Protecting the Buyer of Used Products: Is Strict Liability for Commercial Sellers Desirable?, 33 Stan.L.Rev. 535 (1981) with Note, Sales of Defective Used Products: Should Strict Liability Apply?, 52 S.Cal.L.Rev. 805 (1979).

■ We agree with the rationale provided by these courts to the extent it applies to the broad commercial used-product market. We believe, however, that those used-product merchants who rebuild or recondition goods are subject to the strict liability doctrine. The application of strict liability to sellers of used products, who rebuild or recondition those products, helps to protect the reasonable expectations of consumers.

Appellant alleges the trial court erred in finding that recovery was precluded under strict liability because it was not established that the defect caused the accident. We note that we cannot set aside findings of fact unless they are clearly erroneous. *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970).

Before reaching appellant's contention, we first review the standards which must be met to establish strict liability. These standards were set forth in *Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251, 256 (S.D. 1976) (citations omitted, footnote omitted), as follows:

[T]he burden of proof lay with the plaintiff to show that there was a defect in the product at a time when the defendant had possession .... A product is defective when it fails to perform reasonably and safely the function for which it was intended. No specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the accident was caused by a defect.

... [T]he burden of proving causation also lies with the plaintiff. Causation may be established by circumstantial evidence where that evidence establishes by a preponderance, the probability that the accident was caused by a defect. We do not require that plaintiff eliminate all other possible explanations of causation that the ingenuity of counsel might suggest. It is sufficient that plaintiff negate his own and others' misuse of the product.

In addition plaintiff has the burden of showing that the defect existed when the product left [defendant's] hands. This burden may also be satisfied by circumstantial evidence.

With these standards in mind, we turn to the evidence presented.

■ At trial, appellant presented two expert witnesses to testify as to the existence of a defect and the cause of the fire. Both witnesses were professors of electrical engineering at the South Dakota School of Mines and Technology in Rapid City, South Dakota. The witnesses examined the dryer after the fire and prepared a report documenting their findings. That report and their testimony concluded that the clothes dryer was defective. They found that contact points on the thermostats were pitted and in a very deteriorated condition. The witnesses believed that the two thermostats malfunctioned, thereby allowing the heat element to rise to temperatures high enough to cause the blanket to ignite. This evidence, coupled with the knowledge that a properly functioning dryer would not start a blanket on fire, leads us to conclude the dryer was defective. As one of the experts noted: "I don't know how I could reach a conclusion other than the dryer is defective if the thing (blanket) you put in it catches fire."

■ As to causation, we can find no credible evidence to support the trial court's position that causation was not established. Here, it is undisputed that appellant did not tamper with or misuse the dryer prior to the fire. Expert testimony established that the dryer was defective and identified the exact components, the thermostats, that failed to function properly allowing the temperature inside the drum to reach temperatures high enough to cause a fire. In our view, this evidence goes well beyond the preponderance requirement in establishing causation.

■ Finally, we look to the requirement that the defect exist when the product was in appellee's hands. Contrary to appellee's assertion, it was not necessary to show appellee created the defect, but only that the defect existed when the product was distributed by and under appellee's control. *Ortiz v. Farrell Co., Div. of U.S.M.*

*Corp.,* 171 N.J.Super. 109, 407 A.2d 1290 (1979). Evidence produced at trial provides sufficient circumstantial evidence to meet this requirement. First, and most obvious, the fire occurred within two weeks of leaving appellee's hands. Second, one of the experts testified that in his opinion one of the thermostats became inoperative quite some time prior to the fire. In his opinion, the back-up thermostat eventually became so worn that it too failed to function properly. Finally, it was established at trial that the wrong type of thermostats were in the dryer at the time of sale.[3] According to the expert testimony, this improper equipment also contributed to the fire's inception. We believe this evidence establishes the existence of a defect while the product was in the hands of appellee.

■ All this aside, however, appellee would have us believe that strict liability is negated in this case because appellant assumed the risk by continuing to use the machine after it overheated on one occasion. At the close of trial, appellee moved to amend its pleadings to allege the defense of assumption of the risk. The trial court in its memorandum opinion and findings of fact and conclusions of law specifically excluded the use of this defense theory.[4] Lacking a notice of review, we must conclude this issue is not preserved for appeal. Even if the trial court had approved the use of the assumption of the risk defense, however, there was no credible evidence to support such a defense theory. While appellant acknowledged the drier on one occasion dried her clothing so that they were "abnormally hot," she simply turned the heat selector to a lower setting. We do not find this an abnormal reaction and cannot imagine that a reasonable person, by so reacting, would thereby assume the risk of a fire starting in the dryer.

While appellant has established that the trial court erred on the strict liability theory, we believe two other theories offered by appellant would also warrant recovery. Accordingly, we will briefly review appellant's express and implied warranty theories.

■ First, appellant contends the trial court erred in not finding a breach of an express ninety-day warranty, pursuant to SDCL 57A–2–313.[5] As noted earlier, a tag was on the dryer on the day of sale representing it to be a "Quality Reconditioned Unit" which was "Tag-Tested" and "Guaranteed." These written representations were coupled with a ninety-day warranty which was given orally. The existence of this ninety-day warranty is not disputed by appellee. In essence, this warranty promised the dryer would work properly for ninety days.

The owner of the store where the dryer was purchased testified that there were no written warranties in this case. To the contrary, the term "guarantee" was used on the tag and the term "warranty" was used

---

3. We note that neither party relied on SDCL 20–9–10 which provides for immunity from damages for personal injury arising under the strict liability doctrine in certain circumstances.

4. The trial court did permit the use of a contributory negligence defense theory in this case. Such a ruling is clearly contrary to *Smith v. Smith,* 278 N.W.2d 155 (S.D.1979), wherein we expressly ruled that contributory negligence is not a defense in strict liability actions.

5. SDCL 57A–2–313 provides:
   (1) Express warranties by the seller are created as follows:
   (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
   (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
   (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
   (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

in the oral representation. This language clearly comes within the ambits of SDCL 57A–2–313 which sets forth the situations in which express warranties are created.

■ The trial court denied recovery under the breach of warranty theory stating appellant "failed to prove his injuries were caused by a breach of warranty caused by defendant." Appellee promised the dryer would work properly for ninety days. Instead, the product was defective; it ignited a blanket and the ensuing fire caused damages in excess of $25,000. We have no choice but to conclude the trial court was clearly erroneous in denying recovery under this theory. But for the defective dryer, no fire would have ensued. Appellant is entitled to consequential damages equal to her injury, pursuant to SDCL 57A–2–715(2)(b).

Appellee, however, relying on the official comments to U.C.C. 2–715(2)(b) [SDCL 57A–2–715(2)(b)], asserts consequential damages should not be awarded "if he (appellant) did in fact discover the defect prior to his use [then] the injury would not proximately result from the breach of warranty." As we noted earlier, we do not view appellant's reaction to overheated clothes to be unreasonable and we cannot agree with appellee that such action amounted to "discovering the defect" and thus deprives appellant of consequential damages.

■ Finally, appellant correctly notes that SDCL 57A–2–314 [6] provided an implied warranty of merchantability to accompany the sale of this dryer. In other words, the dryer would be fit for the ordinary purposes for which clothes dryers are used. While we have not so ruled, we now conclude that implied warranties granted under the U.C.C. apply to used goods. *Worthey v. Specialty Foam Products, Inc.,* 591 S.W.2d 145 (Mo.App.1979); *Natale v. Martin Volkswagen, Inc.,* 92 Misc.2d 1046, 402 N.Y.S.2d 156 (1978). If the framers of the U.C.C. had intended to exclude such used or secondhand goods from any implied warranties, merchantability or otherwise, they could have easily done so. *See Testo v. Russ Dunmire Oldsmobile, Inc.,* 16 Wash. App. 39, 554 P.2d 349 (1976).

■ We believe it is apparent that the implied warranty of merchantability was broken when the dryer started a fire in its drum because of overheating. Substantial credible evidence was introduced to support this conclusion. By starting a fire, the dryer was no longer fit for the purpose for which it was purchased. But for the breach of this implied warranty, the dryer would not have caused the extensive damages which resulted from the fire. Thus, the breach was the proximate cause of appellant's loss.

For all the reasons set forth above, we reverse the judgment of the trial court and remand this case for entry of a judgment awarding damages in accordance with the stipulation agreed to by the parties.

All the Justices concur.

---

6. SDCL 57A–2–314 provides:

(1) Unless excluded or modified (§ 57A–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (§ 57A–2–316) other implied warranties may arise from course of dealing or usage of trade.