Avon WYNIA, Plaintiff–Appellant,

v.

RICHARD–EWING EQUIPMENT COMPANY, INC.; Defendants–Appellees,

Ametek, Inc., Divine Providence Hospital and Home, Inc., Ivanhoe, Minnesota, Defendants.

No. 92–3917SD.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1993.

Decided Feb. 22, 1994.

Amended March 3, 1994.

LEVIN H. CAMPBELL, Senior Circuit Judge.

On August 17, 1990, fifteen-year-old Michael Whities, plaintiff-appellant, a part-time employee for Tri–State Filter Service of Belle Fourche, South Dakota, lost his left arm just below the shoulder while operating a commercial laundry water extractor (also known as a "spin dryer"), which uses centrifugal force to extract water from laundry. Whities's mother and guardian *ad litem*, Avon Wynia, brought this diversity tort action on Whities's behalf in the United States District Court for the District of South Dakota.[1] Named as defendants were Ametek, Inc., the extractor's manufacturer; Divine Providence Hospital and Home, Inc., the original purchaser of the extractor; Richard–Ewing Equipment Co., Inc., a commercial dealer of laundry equipment that resold the used extractor to Tri–State Filter in 1987; and Ketema, Inc.,[2] a corporation created by Ametek in 1988.

At the close of plaintiff's evidence, the district court directed the entry of judgment as a matter of law on Whities's claims of breach of implied warranty and strict liability against Richard–Ewing. *Wynia v. Ametek, Inc.*, No. 91–5042 (D.S.D. Nov. 3, 1992) (order granting Richard–Ewing's motion for judgment as a matter of law as it related to Whities's claims of breach of implied warranty and strict liability). Whities's strict liability and negligence claims against Ametek and his negligence claims against Richard–Ewing and Divine Providence Hospital went to the jury, which returned verdicts in favor of the defendants. Whities filed a notice of appeal from the final judgment, but has asserted error in his brief only as to the court's granting of judgment as a matter of law on the strict liability claim against Richard–Ewing.[3] We affirm.

Counsel who presented argument on behalf of the appellant was James D. Leach, Rapid City, South Dakota.

Counsel who presented argument on behalf of the appellee was Vincent Purtell, Sioux Falls, South Dakota.

Before ARNOLD, Chief Judge, CAMPBELL, Senior Circuit Judge,[*] and LOKEN, Circuit Judge.

* The HONORABLE LEVIN H. CAMPBELL, Senior United States Circuit Judge for the First Circuit, sitting by designation.

1. The Honorable Andrew W. Bogue, United States District Court for the District of South Dakota.

2. The district court dismissed the claims against Ketema at the close of Whities's case.

3. On October 13, 1993, Whities, Ametek, and Ketema, having resolved all issues in dispute among them, filed a stipulation for dismissal of Whities's appeal as to Ametek and Ketema only. We granted the stipulation. *Wynia v. Ametek, Inc.*, No. 92–3917 (8th Cir. Oct. 14, 1993). Whities does not contest on appeal the judgment entered on the jury verdict in favor of Divine Providence Hospital.

## I.

In 1966, Ametek manufactured the water extractor in question and sold it to Divine Providence Hospital for use in its laundry room. The extractor was built with a cover interlock mechanism, which prevented a person from opening the extractor's lid while the drum inside the extractor was rotating at high speed. Ametek installed this safety mechanism in 1966 in accordance with industry standards providing that extractors be equipped with cover interlock devices. The cover interlock mechanism was an important safety feature because of the known danger that a person could lose an arm if he placed it in the extractor's drum while it was spinning at high speeds.[4]

In 1987, Divine Providence Hospital traded-in the extractor to Richard–Ewing as partial payment towards the purchase of new laundry equipment. At trial, there was evidence that Richard–Ewing's standard business procedure with regard to the purchase of used equipment called for the company to examine machines while they were still in the seller's possession. During this "field examination" Richard–Ewing employees would, among other things, check a machine's motors and safety features. Richard–Ewing's on-site inspection procedures for extractors called for running the machine and checking its cover interlock mechanism. Richard–Ewing employees would try to start the extractor with the lid open and attempt to open the lid when the extractor was running. Notwithstanding, there was evidence at trial that Brian Peterson,[5] the Richard–Ewing employee who handled the trade-in and subsequent sale of the extractor to Tri–State Filter, never test ran the extractor before he removed it from Divine Providence Hospital.

Richard–Ewing had actual possession of the extractor for less than twenty-four hours.

After the extractor was loaded on to Richard Ewing's truck at the Divine Providence Hospital, the extractor was immediately shipped to Tri–State Filter in Belle Fourche, South Dakota. At that time, Tri–State Filter was owned and operated by Cyle Miller. "Richard–Ewing's single-paged bill of sale which accompanied the sale of the extractor to Cyle Miller ha[d] a clear and conspicuous handwritten 'as is' disclaimer, which even Cyle Miller (Plaintiff's own witness) testified meant just what it said." *Wynia v. Ametek, Inc.*, No. 91–5042 (D.S.D. Nov. 3, 1992). It is uncontested that Richard–Ewing did not rebuild or recondition the extractor before it was delivered to Tri–State Filter.

There was evidence that, when Richard–Ewing delivered the extractor to Tri–State Filter, the machine had no "danger" or "warning" labels on it.[6] Moreover, the extractor's lid opened freely when the drum was spinning. Cyle Miller testified that he opened the lid of the extractor while the drum was still spinning approximately 100 times during the two and one-half years that he owned it.[7] Cyle Miller's wife, Rayberta, who helped her husband run Tri–State Filter, testified that she did the same thing four or five times during the same period. The Millers testified to being unaware that they were not supposed to be able to open the extractor's lid while the drum was spinning and that they were subjecting themselves to danger by doing so.

In 1990, the Millers sold Tri–State Filter, including the extractor, to Todd Larsen. At that time, Cyle Miller showed Larsen how to open the extractor's lid while the drum was spinning so that Larsen could "see when the load had actually stopped." On August 16, 1990, Larsen hired Michael Whities as a part-time employee. Larsen showed Whities how to use the extractor. Whities testified

---

**4.** At trial, there was evidence that the historical literature—dating back to the early twentieth century—pertaining to extractors identified the risk that a person's arm could become entangled in and amputated by the spinning drum of an extractor.

**5.** Brian Peterson could not testify on his own behalf because he died prior to the initiation of the present action.

**6.** Larry Jacobsen, Richard–Ewing's owner and manager, testified that no employee of Richard–Ewing affixed a warning label to the extractor when it was sold to Tri–State Filter in 1987.

**7.** Miller would shut the extractor off and then open the lid while the drum was still spinning rapidly. He did this so that he could see when the drum had stopped spinning.

at trial that Larsen instructed him to follow certain sequential steps when operating the machine. According to Whities, Larsen told him to open the extractor's lid while the drum was still spinning, then to hit the machine's stop button, and finally to depress a brake pedal on the extractor to bring the spinning drum to a stop. Contrary to Whities's testimony, Larsen testified that he instructed Whities never to open the lid when the drum was still spinning. There was evidence that, at the time of Whities's injury, there were no warning labels of any kind on the extractor cautioning a user from lifting the lid while the drum was spinning. Moreover, it did not appear to Whities that the machine was in disrepair—the lid lifted easily while the drum was spinning.

On August 17, 1990, during his second day on the job, Whities was operating the extractor. He lifted the extractor's lid while the drum was spinning as he believed Larsen had instructed him to do. Then, as he was reaching over with his right hand to shut the machine off, he lost his balance. Whities's left arm slipped into the open extractor while the machine's drum was spinning at full speed, and the extractor twisted his arm off just below the shoulder.

## II.

In his appellate brief, Whities argues only that the district court erred in granting Richard–Ewing's motion for judgment as a matter of law on the strict liability claim. We therefore review only that issue. See Fed. R.App.P. 28(a)(5) (as amended Oct. 1, 1993) ("The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the

authorities, statutes, and parts of the record relied on."); *Jasperson v. Purolator Courier Corp.*, 765 F.2d 736, 740–41 (8th Cir.1985) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue.").

In *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104 (S.D.1973), the Supreme Court of South Dakota "adopted the strict liability theory, as set forth in Restatement (Second) of Torts § 402A,[8] ... and thereby created a new cause of action in tort." *Crandell v. Larkin & Jones Appliance Co.*, 334 N.W.2d 31, 33 (S.D.1983) (footnote not in original). Ten years later, in *Crandell*, the Supreme Court of South Dakota considered whether the strict liability cause of action in South Dakota should "be broadened to cover the commercial sale of used products." *Id.* The court held that only "those used-product merchants who rebuild or recondition goods are subject to the strict liability doctrine." *Id.* at 34.

In granting Richard–Ewing's motion for judgment as a matter of law on the strict liability claim here, the district court relied on the Supreme Court of South Dakota's decision in *Crandell*.[9] The district court determined that the Supreme Court of South Dakota has "made it clear that in [South Dakota] strict liability will not attach to a seller[, such as Richard–Ewing,] who simply takes in used goods and re-sells them." *Wynia v. Ametek, Inc.*, No. 91–5042 (D.S.D. Nov. 3, 1992).[10] On appeal, Whities concedes that Richard–Ewing did not rebuild or recondition the extractor. Nevertheless, he contends that the district court's reliance on *Crandell* was misplaced. According to Whi-

**8.** Restatement (Second) of Torts § 402A (1965) states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

**9.** There is no dispute that South Dakota law governs the rights of the parties in this case.

**10.** We review de novo the district court's decision to grant Richard–Ewing's motion for judgment as a matter of law. *See Standley v. Chilhowee R–IV School Dist.*, 5 F.3d 319, 323 (8th Cir.1993); *Caudill v. Farmland Indus., Inc.*, 919 F.2d 83, 86 (8th Cir.1990).

ties, a strict liability claim in South Dakota can be predicated either on Restatement (Second) of Torts § 402A or on S.D. Codified Laws Ann. § 20–9–9, which states:

No cause of action based on the doctrine of strict liability in tort may be asserted or maintained against any distributor, wholesaler, dealer or retail seller of a product which is alleged to contain or possess a latent defective condition unreasonably dangerous to the buyer, user, or consumer unless said distributor, wholesaler, dealer or retail seller is also the manufacturer or assembler of said product or the maker of a component part of the final product, *or unless said dealer, wholesaler or retail seller knew, or, in the exercise of ordinary care, should have known of the defective condition of the final product.* Nothing in this section shall be construed to limit any other cause of action from being brought against any seller of a product.

(emphasis added). Whities argues that this statute establishes a more broadly-based cause of action in strict liability against middlemen, separate from Restatement (Second) of Torts § 402A, and that the Supreme Court of South Dakota's decision in *Crandell* applies only to strict liability claims premised on § 402A.[11] Whities insists that section 20–9–9, unlike § 402A of the Restatement, required the sending of his strict liability claim against Richard–Ewing to the jury, regardless of the fact that Richard–Ewing did not rebuild or recondition the extractor.

Richard–Ewing responds to this argument by maintaining that the South Dakota Legislature never intended section 20–9–9 to coexist with, or to replace, Restatement (Second) Torts § 402A as a substantive predicate for strict liability in South Dakota. Rather, according to Richard–Ewing, the South Dakota Legislature merely meant to regulate further the circumstances for imposing strict liability upon a nonmanufacturing middleman or dealer where there could be strict liability under existing law. We agree.

Section 20–9–9 states only that "[n]o cause of action based on the doctrine of strict liability in tort may be asserted or maintained against any distributor, wholesaler, dealer or retail seller [who is not also a manufacturer, assembler, or component maker of the product] ... unless" the listed parties knew or should have known of the product's defective condition. The statute does not state, and we do not think it implies, that all of the listed categories of middlemen are subject to strict liability, without exception or further limitation, so long as they meet the knowledge requirements. It merely says that "no cause of action ... may be asserted or maintained" against such persons unless they meet the knowledge requirement, leaving open the possibility that additional circumstances will bar strict liability in certain cases. Nothing in the wording of section 20–9–9 indicates an intention to do more than impose the specified knowledge requirement. It takes an unreasonable stretching of the language to read the statute as plaintiff would like.

Nor do the apparent aims of the statute support plaintiff's position. Commentators have observed that the South Dakota Legislature passed section 20–9–9 to "protect[ ] South Dakota middlemen who, although they do not participate in the creation of defects, must otherwise answer for injuries under section 402A." Robert Dugan, *Reflections on South Dakota's Trifurcated Law of Products Liability*, 28 S.D.L.Rev. 259, 272 (1983). The South Dakota Legislature is said to have injected a negligence element into a § 402A strict liability claim brought against South Dakota nonmanufacturing middlemen in order to make it more difficult for plaintiffs to recover in strict liability against such middlemen, and to "encourage[ ] the injured party to seek recovery under strict tort and warranty against the remote manufacturer." *Id.* at 272 n. 68. Nothing in this purpose requires reading section 20–9–9 as ruling out the *Crandell* limitation, or as attempting to create an alternative basis for strict liability.

---

11. Although the Supreme Court of South Dakota decided *Crandell* after section 20–9–9's passage in 1979, the court would have had no occasion to refer to section 20–9–9 because the cause of action in *Crandell* arose before the statute's en-

actment. *See* Lora L. Van Dyke, Note, Crandell v. Larkin & Jones: *Products Liability for Used Products Vendors in South Dakota*, 29 S.D.L.Rev. 181, 195 (1983).

The statute simply acknowledges that, in a proper case,

> a seller[, as opposed to a manufacturer, assembler, or component maker,] *may be* strictly liable [under § 402A], but only if he knew or through "ordinary care" should have known of the defective condition of the product. In essence SDCL 20–9–9 says there *may be* strict liability, *but as a matter of proof, knowledge of the defective condition will not be imputed to a non-manufacturing middleman as would otherwise be the case under strict liability.*

*Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 915 (S.D.1987) (reversing trial court's grant of summary judgment in favor of manufacturer and *commercial lessor*) (emphasis added).[12]

■ We conclude that section 20–9–9 does not affect *Crandell*'s holding that, in South Dakota, only those sellers of used goods who rebuild or recondition the goods are subject to strict liability. South Dakota's law, as we construe it, provides that, for a plaintiff to recover against a seller of used goods, the plaintiff must prove not only (as *Crandell* requires) that the seller rebuilt or reconditioned the good, but also that the seller knew, or, in the exercise of ordinary care should have known, of the used good's defective condition. *See* Lora L. Van Dyke, Note, *Crandell v. Larkin & Jones: Products Liability for Used Products Vendors in South Dakota*, 29 S.D.L.Rev. 181, 195 (1983). Because Richard–Ewing, the seller of the used extractor, neither rebuilt nor reconditioned the extractor, nor was otherwise a middle-

man who could be held strictly liable, *see, e.g., Peterson*, 400 N.W.2d 909 (S.D.1987) (commercial lessor), we find no error in the district court's decision to grant Richard–Ewing's motion for judgment as a matter of law on Whities's strict liability claim. We affirm the judgment entered in Richard–Ewing's favor.

*So ordered.*

---

12. Whities's reliance on *Peterson* is misplaced. *Peterson* did not involve a seller of used goods at all. Rather, it held that a *commercial lessor* of goods could be subject to strict liability "if it 'knew, or, in the exercise of reasonable care, should have known of the defective condition of the final product.'" *Peterson*, 400 N.W.2d at 915 (quoting S.D. Codified Laws Ann. § 20–9–9). South Dakota is not the only jurisdiction that distinguishes sellers of used goods from commercial lessors of goods. In Missouri, for example, the courts have recognized a cause of action in strict liability against commercial lessors. *See, e.g., Gabbard v. Stephenson's Orchard, Inc.*, 565 S.W.2d 753, 757 (Mo.Ct.App.1978) (allowing strict liability claim against "bailor or lessor of a defective product in the usual course of business, i.e., a lessor or bailor for the mutual benefit of the parties in a commercial transaction comes

under the rule of strict liability irrespective of sale"). Nevertheless, strict liability in Missouri has not been absolutely extended to sellers of used goods. *Harber v. Altec Indus., Inc.*, 812 F.Supp. 954, 965–66 (W.D.Mo.) (finding that "the Missouri Supreme Court would not extend strict liability to include ... sellers of used goods who perform no maintenance, modification or repair on the used product and who successfully disclaim all warranties of title"), *aff'd*, 5 F.3d 339 (8th Cir.1993). *Compare Amoroso v. Samuel Friedland Family Enters.*, 604 So.2d 827, 834 (Fla.Dist.Ct.App.1992) (holding that doctrine of strict liability applies to a commercial lease transaction), *review granted*, 618 So.2d 1369 (1993) *with Keith v. Russell T. Bundy & Assocs., Inc.*, 495 So.2d 1223, 1227 (Fla.Dist.Ct.App. 1986) ("Strict liability does not apply to a dealer in used equipment.").