[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE MOTION FOR SUMMARY JUDGMENT (No. 143)
For almost three decades, "American courts have struggled with the question of whether to hold commercial sellers of used products to the same legal standards of responsibility for defects as commercial sellers of new products." Restatement (Third) of Torts: Products Liability § 8 cmt. a (1998). No published Connecticut decision has squarely addressed this issue, and courts of other jurisdictions are divided on the subject. Tracy A. Bateman, Annotation, Products Liability: Application ofStrict Liability Doctrine to Seller of Used Product, 9 A.L.R. 5th 1 (1993). The United States Court of Appeals for the Seventh Circuit has recently held, in a diversity action, that under Connecticut law a dealer of used goods is not strictly liable for defects in the products it sells "as is." King v. Damiron Corp. ,113 F.3d 93 (7th Cir. 1997). King, however, bases its holding not on any nuance of Connecticut statutory or decisional law but on an admittedly cautious balancing of more general policy considerations. Id. at 97. Given this fact, King, while entitled to great respect, cannot be considered binding authority in the Connecticut courts. For the reasons explained below, King should not be applied to defeat the products liability claim presented here.
The products liability issue now before the court arises in the context of a motion for summary judgment filed by the defendant, Carlson Sales, Inc. ("Carlson"). Because Carlson relies almost solely on King, which invalidates strict liability claims directed against sellers of used goods in rather general terms, the evidence presented to the court focuses on the sales history of the product in question rather than its alleged design defect or any narrative of the claimed injury. The plaintiff, Mark Stanton ("Stanton"), alleges that on January 15, 1991, he was an employee of R D Precision ("R D"), a small machine shop in Wallingford. He was assigned to operate an industrial punch press (the "press"). While operating the press, he sustained severe injuries to his left hand, losing three fingers. He claims that the press was defectively designed because its hazardous areas were ineffectively guarded. He also claims that CT Page 11989 the press failed to contain adequate warnings of the dangers it presented and that Carlson, the company that had sold the press to R D, negligently failed to test the press prior to the sale and breached warranties, both express and implied.
Carlson's evidence establishes that the press was manufactured in 1969 by a company formerly known as Niagra Machine Tool Works Company. (The record does not establish whether the manufacturer currently exists under a new name or has gone out of business.) On August 24, 1987, Carlson purchased the press as a used machine from United Precision, Inc. On September 8, 1987, Carlson sold the press in used condition and "as is" to William and David Harkness. Carlson did not at any time make any modifications or repairs to the press. David Harkness is the president of R D. The record is silent on whether any modifications or repairs were made to the press by United Precision, Inc., the Harknesses, or any other owners.
Stanton and his wife, Terri Stanton, commenced this action by service of process on January 5, 1994. Carlson is the sole defendant. The amended complaint is in two counts. In the first count, Stanton claims that Carlson, as the seller of the press, is liable for his injury under Connecticut's Product Liability Act. Conn. Gen. Stat. §§ 52-572m-572q (the "Act"). In the second count, Terri Stanton claims loss of consortium resulting from her husband's injuries. Carlson filed the motion for summary judgment now before the court on July 27, 1998. The motion was heard on September 28, 1998.
It is helpful to begin with a brief review of the Connecticut decisional law relating to this issue. In Garthwait v. Burgio,153 Conn. 284, 216, 216 A.2d 189 (1965), our Supreme Court "recognized a products liability cause of action sounding in tort and became one of the first jurisdictions to adopt the rule provided in [Restatement (Second) of Torts] § 402A [(1965)]."Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 214,694 A.2d 1319 (1997). The Court has long recognized that "the essence of the tort of strict liability is the manufacture and sale of a defective product." Prokolkin v. General Motors Corp. ,170 Conn. 289, 299, 365 A.2d 1180 (1976). Although the Court has not squarely considered the issue presented in this case, its recorded decisions have not distinguished the sale of used goods from that of new goods. In Nichols v. Coppola Motors, Inc.,178 Conn. 335, 422 A.2d 260 (1979), the Court, without discussion of the point now in question, affirmed a plaintiff's verdict, based CT Page 11990 in part on a theory of strict liability in tort, against the seller of a used car. In Rossignol v. Danbury School ofAeronautics, Inc., 154 Conn. 549, 227 A.2d 418 (1967), a suit against the manufacturer of an airplane that had been resold as used subsequent to manufacture, the court observed that some products liability cases would involve sales of used products such as "a used, secondhand machine." Id. at 562. The Court stated that a plaintiff in such an action must allege and prove "not only . . . that the defendant sold the product, that it was in a defective condition unreasonably dangerous to the user or consumer or to his property, that it caused physical harm to the consumer or user or to his property . . . and that the seller was engaged in the business of selling such a product but also that the product was expected to and did reach the user or consumer without substantial change in the condition in which it was sold." Although Rossignol was, as mentioned, a suit against a manufacturer, the focus of the passage just quoted on the condition of the product at the time of sale is important for purposes of this case. If liability is determined by the condition of the product in question at the time of manufacture, a dealer who subsequently sells it as a used product in deteriorated or altered condition may be insulated from liability. If, on the other hand, liability is, as Rossignol
suggests, determined by the condition of the product at the time of sale, a dealer is responsible for the condition of the product that it sells.
This analysis is confirmed, at least to some extent, by the text of the Act itself. Conn. Gen. Stat. § 52-572n(a) provides that, "A product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." "Product seller" is a term of art. It is defined by Conn. Gen. Stat. § 52-572m(a) as "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." The statutory text does not distinguish between sellers of new and used products. The Act contains no language limiting its application to cases involving design or manufacturing defects in new products. As the Minnesota Court of Appeals observed in an analogous case, "If the legislature had wanted to place these restrictions on the law, it could have done so." Gorath v. Rockwell International, Inc., 441 N.W.2d 128, 132
(Minn.App. 1989). CT Page 11991
The text of the Act must be approached with some caution in determining the existence of substantive rights. Our Supreme Court has noted that the legislature, in drafting the Act, "was merely recasting an existing cause of action and was not creating a wholly new right for claimants harmed by a product. The intent of the legislature was to eliminate the complex pleading provided at common law." Lynn v. Haybuster Manufacturing, Inc.,226 Conn. 282, 292, 627 A.2d 1288 (1993). See LaMontagne v. E.I. Du Pont DeNemours Co., 41 F.3d 846, 855-56 (2d Cir. 1994); Winslow v.Lewis-Shepard, Inc., 212 Conn. 462, 469-71, 562 A.2d 517 (1989). Because of this fact, common law doctrine has been more important than textual analysis in construing the Act. Under these circumstances, it would be inappropriate to create a new right, unsupported by common law, solely by reference to the statutory text.
Lynn and Winslow do, however, suggest that the legislative history of the Act, as distinct from its text, is of considerable importance in its construction. See Lynn,supra, 226 Conn. at 292; Winslow, supra, 212 Conn. at 469-71. The legislative history of the Act pertaining to the rights of persons injured by used products is surprisingly informative. Since much of this history is undiscussed in the published case law, it is worth reviewing in detail.
The Act "is based on the Draft Uniform Product Liability Law (draft act) published by the Department of Commerce on January 12, 1979, in 44 Fed. Reg. 2996 et seq. for public comment."Elliot v. Sears, Roebuck Co., 229 Conn. 500, 505, 642 A.2d 709
(1994). The definition of "product seller" in Conn. Gen. Stat. § 52-572m(a), quoted above, is taken verbatim from § 102(1) of the draft act. 44 Fed. Reg. at 2997. An analysis of this definition accompanying the draft act states that the draft act "does not indicate whether a commercial seller of used products is subject to liability under the [draft act]. This issue is left for resolution as a matter of individual state policy." Id. at 3003.
The analysis just quoted makes it clear that the definition of "product seller" contained in Conn. Gen. Stat. § 52-572m(a) is not itself dispositive of the question now before the court. A further review of the legislative history of the Act, however, reveals that the Connecticut legislature, in framing the Act, expressly considered the problem of injuries caused by used CT Page 11992 products and gave particular consideration to the specific problem of employees injured by such products. This consideration occurred in the context of the statute of limitations problems created by such injuries. Because this is an area both where the problem now before the court was at least indirectly discussed and where the legislature specifically chose to depart from the provisions of the draft act, a careful review of the pertinent legislative history is warranted.
The draft act contained a statute of repose that would have severely limited the rights of employees, like Stanton, injured by products over ten years old. Draft act § 109(B)(1)(a) provided that, "A claimant entitled to compensation under a state worker compensation statute may bring a product liability claim under this Act for harm that occurs within ten (10) years after delivery of the completed product to its first purchaser or lessee who was not engaged in the business of selling products of that type." 44 Fed. Reg. at 2999. This provision, if enacted, would in all likelihood have foreclosed the present action by Stanton, who was, as mentioned, injured by a machine manufactured in 1969. As will be seen, however, this provision was the subject of repeated amendment in the course of the legislative process.
The first relevant amendment to the statute of repose provision contained in the draft act came in the Judiciary Committee. The bill reported by the Judiciary Committee contained a statute of repose even more severe than that of the draft act. The bill provided that, "In any product liability claim arising out of and in the course of employment, a claimant entitled to compensation under chapter 568 may bring a product liability claim under this act for harm that occurs within eight years after delivery of the completed product to its first purchaser or lessee who was not engaged in the business of selling products of that type." Judiciary Committee Bill No. 5870, § 3(d) (1979). A further provision of the bill provided that, in case of harm occurring more than eight years after such delivery, a claimant would be permitted to rebut, by clear and convincing evidence, a presumption that the product had "been utilized beyond its useful life." Id., § 3(e). On May 10, 1979, the House of Representatives passed the Judiciary Committee bill without floor amendment, after specific consideration of the problem of employees injured by machinery in the workplace. 22 H.R. Proc., Pt. 20, 1979 Sess., pp. 7022, 7024.
On May 11, 1979, however, the House voted to reconsider its CT Page 11993 action. The House was plainly both troubled and confused by the statute of limitations provision that it had passed on the previous day. See 22 H.R. Proc., Pt. 21, 1979 Sess. p. 7237. (Statement of Rep. Berman). It voted to delete that provision and substitute a substantially altered provision in its place. The amendment provided that, "no such action may be brought against any party . . . later than ten years from the date that such party last parted with possession or control of the product." 1979 House Journal at 1717. This amendment eventually passed both houses of the legislature and is now codified in Conn. Gen. Stat. § 52-577a(a).
The amendatory language just described is of great significance in cases, like the one now before the court, involving employees injured by used machines. Under the draft act and the Judiciary Committee bill, such workers could bring suit only within a limited period of time "after delivery of the completed product to its first purchaser or lessee who was not engaged in the business of selling products of that type." In a case, like the present one, involving a machine recently sold on the market but manufactured decades ago, an injured employee would almost certainly be without recourse. The amendatory language alters this situation significantly. The question now is not when the product was delivered to its first purchaser but when the party being sued "last parted with possession or control of the product." The latter event can obviously occur at a much later point in time than the former. Moreover, the focus is now squarely on the conduct of the party being sued in parting with the product rather than the early history of the product. The amended Act consequently imposes a significant potential liability on sellers of used goods that did not exist under the draft act.
Doctrinal considerations are also important. While our Supreme Court focused on the legislative history of the Act inLynn and Winslow, its more recent construction of the Act in Potter employs a doctrinal analysis. The same is true of its discussion of the Act a few months later in Wagner v. ClarkEquipment Co., 243 Conn. 168, 186-200, 700 A.2d 38 (1997). A doctrinal approach is appropriate because, as mentioned, the Court has viewed the Act as a modernized procedural structure into which evolving common law notions of substantive tort liability are to be placed by the courts. Because of this fact, it is necessary to review the doctrinal considerations relevant to the claim presented here. CT Page 11994
Potter observes that, "Products liability law has . . . evolved to hold manufacturers strictly liable for unreasonably dangerous products that cause injury to ultimate users." 241 Conn. at 210. A footnote to the passage just quoted points out that under Conn. Gen. Stat. § 52-572m(a) liability is also imposed on sellers.Id. n. 6. Potter does not suggest that the strict tort liability imposed on sellers differs from that imposed on manufacturers. It is, on the contrary, well established in Connecticut that the doctrine of strict tort liability applies equally to manufacturers and sellers alike. Marko v. Stop Shop, Inc.,169 Conn. 550, 556, 364 A.2d 217 (1975). "Liability is imposed on . . . successive sellers, not because they caused the defect, but merely because they sold the defective product." Id.
The imposition of strict tort liability on persons engaged in the business of selling products for use or consumption is a central requirement of § 402A of the Restatement (Second) of Torts, which is, in turn, as Potter explains, the foundation stone of Connecticut products liability law. 241 Conn. at 214. Sec. 402A(1) makes no distinction between new and used goods. It imposes strict tort liability on "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer." (Emphasis added.) An important comment to § 402A states that, "The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods." Restatement (Second) ofTorts, supra, § 402A cmt. f. Marko cites comment f favorably. 169 Conn. at 556. While comment f distinguishes between types of sellers, it does not distinguish between types of goods. The distinction that it draws is one between persons engaged in the business of selling products for use or consumption and occasional sellers of products who are not engaged in that activity as part of their business. Since Carlson does not claim the benefit of this distinction, it need not be further discussed. Comment f does not, however, distinguish between the sale of new goods and the sale of used goods. It is facially applicable to both. See Hovenden v. Tenbush,529 S.W.2d 302, 306 (Tex.Civ.App. 1975); Nelson ex rel. Hibbard v. NelsonHardware, Inc., 467 N.W.2d 518, 523-24 (Wis. 1991).
To the extent that statutory text, legislative history, and CT Page 11995 the text of § 402A and comment f are controlling, the case for imposition of strict tort liability on sellers of used goods is plainly a strong one. The difficulty in the case arises from the fact that the public policy considerations prompting the imposition of strict tort liability on sellers of new goods do not necessarily, or at least uniformly, support imposition of the same liability on sellers of used goods. When the latter subject is examined, it turns out that the doctrinal arrows point in different directions.
In a famous comment, the drafters of § 402A explain the theoretical basis of strict tort liability in the following terms:
 On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.
Restatement (Second) of Torts, supra, § 402A cmt. c. Perhaps because it strikes so many resonant chords, comment c has been cited favorably by numerous courts, including our Supreme Court. Wagner v. Clark EquipmentCo., supra, 243 Conn. at 194; Sanderson v. Steve Snyder Enterprises, Inc.,196 Conn. 134, 145-46, 491 A.2d 389 (1985); Hoelter v. Mohawk Service, Inc.,170 Conn. 495, 505, 365 A.2d 1064 (1976). But the very number of justifications invoked by the comment makes it clear that strict tort liability serves several different objectives that cannot be entirely reconciled with each other. See Martin A. Kotler,Reconceptualizing Strict Liability in Tort: An Overview, 50 Vand. L. Rev. 555, 598 (1997).
Although the traditional policy justifications of strict tort liability can be categorized in a number of different ways — see,e.g., Potter v. Chicago Pneumatic Tool Co., supra, 241 Conn. at 209 — they "may be viewed as furthering two overall objectives pursued generally by systems of tort liability: fairness, in the sense of furthering shared CT Page 11996 notions of social morality; and efficiency, in the sense of eliminating unnecessary accident costs." James A. Henderson, Jr., Extending theBoundaries of Strict Products Liability: Implications of the Theory of theSecond Best, 128 U. Pa. L. Rev. 1036, 1041 (1980). Each of these objectives finds support in Connecticut case law. One "purpose of this rule `is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves'" Potter v. Chicago PneumaticTool Co., supra, 241 Conn. at 209 (quoting Greenman v.Yuba Power Products, Inc., 377 P.2d 897, 901 (Cal. 1962). Another purpose is to create "strong economic influences on the conduct of a designer or manufacturer." Sanderson v. Steve Snyder Enterprises,Inc., supra, 196 Conn. at 146. The doctrinal problem in this case is that imposition of strict tort liability on sellers of defective used goods, while obviously serving the first purpose, does not so obviously further the second.
The fairness argument for the imposition of strict tort liability on sellers of used goods is in many respects as strong as the fairness justification traditionally employed for the imposition of such liability on sellers of new goods. "`[T]he seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it'" Hoelter v.Mohawk Service, Inc., supra, 170 Conn. at 505 (quoting comment c). Persons injured by defective used products are likely to be just as "powerless to protect themselves" — Potter v. Chicago PneumaticTool Co., supra, 241 Conn. at 209 — as persons injured by defective new products. This is certainly the case when, as here, the person injured is not the purchaser of the product. Although purchasers ordinarily have at least some opportunity to choose among competing products and by virtue of that position enjoy a corresponding power in the marketplace, third parties, such as employees and bystander victims, have no such opportunity or power. Sellers of used goods, like sellers of new goods, have a special responsibility for product safety arising from that fact.
A related rationale for strict tort liability is that "certain losses are better distributed in our society not on the basis of fault, but rather with regard to the ability of the involved parties to absorb them." Sanderson v. Steve SnyderEnterprises, Inc., supra, 196 Conn. at 145. In the case of a sale of used goods, as in the case of a sale of new goods, "it is the seller which is in the best position to distribute the costs of CT Page 11997 the risk created by the defective product it has sold." Nelson exrel. Hibbard v. Nelson Hardware, Inc., supra,467 N.W.2d at 524
n. 6. It is true that a seller of used goods, unlike a seller of new goods, may not be in a position to seek indemnification against a manufacturer "due to such problems as statutes of limitation and the increasing difficulty as time passes of locating a still existing and solvent manufacturer." Tillman v.Vance Equipment Co., 596 P.2d 1299, 1304 (Ore. 1979). Such a seller, however, still retains at least two alternative means of absorbing the loss in question. First, a seller of used goods, like a seller of new goods, nay pass the cost on to the consumer by increased prices. Second, again like a seller of new goods, a seller of used goods may protect itself by purchasing liability insurance. Nelson ex rel. Hibbard v. Nelson Hardware, Inc.,supra, 467 N.W.2d at 524. Comment c envisions precisely such burden-shifting economic arrangements with respect to sales of all descriptions.
While a seller of used goods may be in a somewhat inferior position to that of a seller of new goods in its ability to absorb such losses, its position remains vastly superior to that of a person injured by a defective product that it has sold. "Sellers of used goods may . . . distribute their costs of doing business which, in turn, will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods." Turner v. International HarvesterCo., 336 A.2d 62, 69 (N.J.Super.Ct. Law Div. 1975).
Some economic factors, however, suggest that the argument for strict tort liability in this area is not as strong as in the case of the sale of new goods. One of the classic arguments in favor of the imposition of strict tort liability against sellers of new goods is that such sellers have a "continuing business relationship" with the manufacturers of those goods. SeeVandermark v. Ford Motor Co., 391 P.2d 168, 172 (Cal. 1964). Because of this ongoing relationship, the argument goes, the retailer is able to place economic pressure on the manufacturer to produce safer products. In addition, it is thought that the manufacturer and the retailer will be able to "adjust the costs of such protection between them." Id. Our Supreme Court has found these arguments to be powerful ones. Potter v. Chicago PneumaticTool Co., supra, 241 Conn. at 209; Sanderson v. SteveSnyder Enterprises, Inc., supra, 196 Conn. at 146. This argument is less persuasive in the case of sellers of used goods. As the Oregon Supreme Court has observed, CT Page 11998
 [T]he position of the used-goods dealer is normally entirely outside the original chain of distribution of the product. . . The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about dangerous defects in particular product lines or about actual or potential liability claims.
Tillman v. Vance Equipment Co., supra, 596 P.2d at 1304.
A separate economic argument frequently invoked against the imposition of strict tort liability against sellers of used goods involves a claimed market distortion that such an imposition would promote. The market distortion theory argues that, "Used products sold by noncommercial sellers substitute easily for commercially sold used products. Thus, if strict liability drove up prices of commercially sold used products, many consumers would shift to cheaper and readily available noncommercial substitutes." David B. Goodwin, Note, Protecting the Buyer ofUsed Products: Is Strict Liability for Commercial SellersDesirable?, 33 Stan. L. Rev. 535, 538 (1981). The classic example of this argument involves the sale of used cars. Used cars, as is well known, may be purchased from either dealers or occasional sellers. Dealers are subject to § 402A liability; occasional sellers are not. If strict tort liability is imposed on sellers of used cars, used car dealers will be compelled to raise their prices to pass the cost of that liability on to the consumer. Occasional sellers, not being subject to § 402A liability in the first place, will be able to keep their prices steady and thus undercut dealers. This outcome will arguably distort the marketplace without conferring any benefit on persons injured by defective used cars.
The economic arguments just described are worthy of consideration but not dispositive. Their force is offset by a number of other economic factors. In the first place, while many dealers of used goods have no ongoing relationship with manufacturers and distributors, at least some do. Used car sales are a familiar example. Many new car dealers sell used cars of the same manufacture as their new cars on the side. Some manufacturers of expensive automobiles aggressively advertise the sale of "pre-owned" vehicles. There is no persuasive reason to CT Page 11999 insulate products of this description from the ambit of strict tort liability.
Second, the imposition of strict tort liability on sellers of used goods is likely to serve some function in deterring the sale of defective goods. "The various tort rules that determine which foreseeable losses are recoverable aim, in part, to provide appropriate safe-product incentives." Saratoga Fishing Co. v. J.M.Martinac Co., 117 S.Ct. 1783, 1787 (1997). "[I]mposing strict liability on the commercial dealer of used products should result in increased maintenance and inspection of such products before they are offered for sale." Jordan v. Sunnyslope AppliancePropane Plumbing Supplies Co., 660 P.2d 1236, 1240
(Ariz.Ct.App. 1983). Moreover, the imposition of such liability "may impel a retail seller to purchase only from other other sellers or manufacturers who, under threat of liability as a matter of law, will correct or prevent the manufacture of dangerously defective products." Nelson ex rel. Hibbard v. Nelson Hardware, Inc.supra, 467 N.W.2d at 525.
Third, the market distortion argument ignores the alterative distortion that would inevitably result from a refusal to impose strict tort liability on dealers of used goods. "Used goods certainly present a risk of danger to the public from defects equal to if not greater than that of new products." Gonzalez v.Rutherford Corp. , 881 F. Sup. 829, 843 (E.D.N.Y. 1995). The imposition of strict tort liability on sellers of new goods and a concomitant refusal to impose that liability on sellers of used goods would mean that the former class of dealers would be compelled to increase prices to pass on the costs of liability and the latter class would not. Such a decision would give sellers of used, and by hypothesis riskier, goods a competitive advantage in the marketplace. James A. Henderson, Jr., supra, 128 U. Pa. L. Rev. at 1084. This result would at once distort the marketplace and harm persons injured by defective products.
It must also be recognized that the arguments just reviewed are economic rather than legal. Judicial decisions involving the ambit of products liability law must be shaped by considerations not of economics but of public policy. The remedies of injured persons ought not to be made to depend upon the intricacies of economic theory. See Ketterer v. Armour Co., 247 F. 322, 323 (S.D.N.Y. 1912). Whatever the dictates of economics, strict liability may be imposed on commercial used-product sellers "out of a sense of fundamental fairness, or as a means of spreading CT Page 12000 defect-related accident costs to the greatest extent possible." James A. Henderson, Jr., supra, 128 U. Pa. L. Rev. at 1084.
Several public policy reasons for the imposition of strict tort liability against sellers of used goods have already been discussed. One additional factor, involving considerations of fairness rather than economics, must also be mentioned. In cases involving injuries resulting from defective used goods, there is a significant distinction between a purchaser who has purchased a used product in "as is" condition and a third party, such as an employee or bystander, who has played no role in the purchase.
A person who has knowingly purchased a used product in "as is" condition is plainly not in the same position as a person who has purchased a newly manufactured item. The person who purchases a newly manufactured product is plainly entitled to expect that product to be in safe and proper working condition. The person who purchases a used product in "as is" condition can have no such realistic expectation. For him, the ancient doctrine of caveat emptor makes at least some intuitive sense. There are, however, important reasons of public policy that even the most willing purchasers of used products should not be sold unreasonably dangerous products. Injuries to such purchasers may cause at least some consequent harm to the general public which must often pay for resulting medical treatment as well as lose the contribution that the injured person would make to society had the injury not occurred. The more compelling problem, however, involves injuries to third parties who are also endangered by defective products. For an employee, like Stanton, or a bystander victim of a defective product, the doctrine of caveat emptor makes no sense whatsoever. Persons of this description have not chosen to purchase a product at all, and when they are injured by defective used products, they are in precisely the same position as persons injured by defective new products. If, to use Cardozo's famous words, "to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser," those responsible for putting a dangerous product on the market have a special responsibility imposed by law. McPherson v. Buick Motor Co., 111 N.E. 1050,1053 (N.Y. 1916).
The impact of the newly released Restatement (Third) ofTorts: Products Liability, supra, must now be considered. On May 20, 1997, the American Law Institute adopted a new restatement of the law of products liability that has already proven CT Page 12001 controversial and will predictably provide grist for the judicial mill for years to come. Section 8 of the Third Restatement specifically addresses the liability of commercial sellers and distributors of defective used products. To simplify this complex provision slightly, a commercial seller of used products who sells a defective used product is subject to liability for harm to persons or property caused by the defect under four specific circumstances: (a) if the defect "arises from the seller's failure to exercise reasonable care;" (b) if "the seller's marketing of the product would cause a reasonable person in the position of the buyer to expect the used product to present no greater risk of defect than if the product were new;" (c) if the used product is "remanufactured by a seller or a predecessor in the commercial chain of distribution of the used product;" or (d) if the defect "arises from a used product's noncompliance . . . with a product safety statute or regulation applicable to the used product." Id. § 8.
The Third Restatement must be approached with considerable caution. The drafters of the Third Restatement have attempted not merely to restate existing doctrine but to move it in what they consider to be the right direction. Martin A. Kotler,Reconceptualizing Strict Liability in Tort: An Overview, 50 Vand. L. Rev. 555, 603 (1997). As § 8 indicates, the drafters, controversially, have decided "to reintroduce nineteenth-century concepts of `fault' into modern products liability law in the form of negligence." Howard Klemme, Comments to the Reporters andSelected Members of the Consultative Group, Restatement of Torts(Third): Products Liability, 61 Tenn. L. Rev. 1173, 1173 (1994). Our Supreme Court noted the Third Restatement's controversial nature in Potter and declined to adopt that restatement's reasonable alternative design requirement on the ground that such a requirement "imposes an undue burden on plaintiffs that might preclude otherwise valid claims from jury consideration."241 Conn. at 217.
Given the Supreme Court's uncordial reception of the Third Restatement in Potter, it would be inappropriate for a lower court to uncritically adopt the provisions of that restatement as limitations on the rights of plaintiffs in products liability cases. It is worth noting, however, that even if the fault-based analysis of § 8 were to be adopted, Stanton's claim would survive the motion for summary judgment now before the court. In addition to his strict tort liability claims, Stanton alleges in his amended complaint that, "The Defendant was negligent in CT Page 12002 failing to properly and adequately test the safety aspect of the punch press prior to it's [sic] sale." Amended complaint ¶ 6(I). While the affidavits submitted by Carlson make it clear that the press was sold in "as is" condition without remanufacturing, those affidavits do not indicate what care, if any, Carlson used. Under these circumstances, Stanton has stated a cognizable, and as yet unchallenged, claim under § 8(a).
It should, however, be made clear that this court's decision is not based on the narrow footing of Third Restatement § 8. Rather, our Supreme Court has made it clear, in Potter and numerous other decisions, that the strict tort liability doctrine of Second Restatement § 402A is the law of Connecticut. That doctrine makes no distinction between sellers of new and used goods. King v. Damiron Corp., supra, in making such a distinction, does not accurately state Connecticut law. "Liability is imposed on . . . successive sellers, not because they caused the defect, but merely because they sold the defective product." Marko v. Stop Shop, Inc., supra, 169 Conn. at 556.
The motion for summary judgment is denied.
Jon C. Blue Judge of the Superior Court