No. 99,990

GABRIEL GAUMER, *Appellant*, v. ROSSVILLE TRUCK AND TRACTOR
COMPANY, INC., A Kansas Corporation; INTERNATIONAL TRUCK
AND ENGINE CORPORATION, A Delaware Corporation; and
CNH AMERICA, LLC, A LIMITED LIABILITY COMPANY,
*Appellees*.

(257 P.3d 292)

Opinion filed August 12, 2011.

*Pedro L. Irigonegaray*, of Irigonegaray & Associates, of Topeka, argued the
cause, and *Elizabeth R. Herbert*, of the same firm, was with him on the briefs for
appellant.

*Richard W. James*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *Dustin L. DeVaughn*, of the same firm, was with him on the briefs for appellees.

The opinion of the court was delivered by

BEIER, J.: This case requires us to decide whether Kansas law recognizes a strict liability claim against the seller of a used product.

Plaintiff Gabriel Gaumer filed suit against Rossville Truck and Tractor Company, Inc. (Rossville) alleging negligence and strict liability for injuries caused by a used hay baler purchased from Rossville. The district court granted Rossville's motion for summary judgment on both the negligence and strict liability claims. The Court of Appeals affirmed the district court's decision regarding Gaumer's negligence claim but reversed on his strict liability claim. Rossville petitioned for review, and this court granted the petition on the single issue of whether strict liability can be applied to a seller of used goods.

## FACTUAL AND PROCEDURAL BACKGROUND

Gaumer's father purchased the used hay baler "as is" on June 3, 2003. The baler was missing a safety shield on its side, which would have been part of the baler when it was originally manufactured and sold.

A week later, the baler malfunctioned while Gaumer was using it. He parked the baler and let its engine idle while he knelt or squatted near its side to investigate the problem. Gaumer placed his right hand on the outside of the baler for support and observed its internal operation through the hole left by the missing safety shield. When he attempted to stand up straight, he slipped, and his left arm entered the same hole in the baler. Gaumer's arm became caught in the baler's internal moving parts, and he suffered an amputation just below his left elbow.

Gaumer claimed Rossville was negligent by failing to warn about the potentially dangerous condition of the baler without the safety shield, negligent by failing to inspect the baler before the sale to Gaumer's father, and strictly liable for selling a product in an unreasonably dangerous condition.

Gaumer provided an expert witness report from engineer Kevin B. Sevart. Sevart opined that Gaumer's injuries were "significantly enhanced due to the absence of a safety device designed to specifically limit injuries in an accident such as he experienced." The report also stated: "It has long been known by engineers and the agricultural equipment industry that shields which must be removed for, or which interfere with, routine maintenance will not likely be maintained on the machine."

The district court judge granted summary judgment on the negligence and strict liability claims, holding that the expert report's failure to mention any legal duty of Rossville to warn or inspect meant that he could not simply "piggyback the opinion of defectiveness from the manufacturer to the seller." The judge also cited two cases from the federal District Court of Kansas, *Sell v. Bertsch & Co. Inc.*, 577 F. Supp. 1393 (D. Kan. 1984), and *Stillie v. AM Intern., Inc.*, 850 F. Supp. 960 (D. Kan. 1994), that predicted this court would not apply strict liability to sellers of used goods.

The Court of Appeals affirmed the summary judgment on the negligence claims for failure to provide expert testimony on the standard of care of a used implement dealer. The panel reversed, however, on the strict liability claim, holding that (1) the expert opinion was sufficient to establish a prima facie case for strict liability, and (2) Kansas law, as so far enunciated by this court, supports a strict liability claim against a seller of used goods. It relied on caselaw; strict liability pattern instructions; and the Restatement (Second) of Torts § 402A (1964), which make no distinction between sellers of used and new goods, declining to carve out an exception to the Restatement rule without guidance from this court.

## ANALYSIS

### Standard of Review

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for

summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" ' " *Troutman v. Curtis*, 286 Kan. 452, 454-55, 185 P.3d 930 (2008) (quoting *Nungesser v. Bryant*, 283 Kan. 550, 556, 153 P.3d 1277 [2007]).

The parties agree that there are no material factual disputes 'in this case, and the sole question on this petition for review is a purely legal one. Our review is thus de novo. *Cooke v. Gillespie*, 285 Kan. 748, 754, 176 P.3d 144 (2008). In addition, to the extent our analysis requires statutory interpretation or construction, our review is unlimited. *Delaney v. Deere & Co.*, 268 Kan. 769, 775, 999 P.2d 930 (2000).

*Sources of Law*

We begin by determining whether to answer the legal question by looking solely to the Kansas Product Liability Act (KPLA), K.S.A. 60-3301 *et seq.*, or at the KPLA and Kansas common law. In other words, does the KPLA supersede Kansas common law on this question?

The KPLA states that a

" '[p]roduct liability claim' . . . includes, but is not limited to, any action previously based on: strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or under any other substantive legal theory." K.S.A. 60-3302.

Generally, this court does not engage in an examination of legislative history unless the language of a statute is ambiguous. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1194, 221 P.3d 1130 (2009) (citing *In re K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025 [2007], *cert. denied sub nom Hendrix v. Harrington*, 555 U.S. 937 [2008]). When language is ambiguous, the court looks to the " 'historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effects the statute may have under the various constructions suggested' " to determine legislative intent. *In re M.F.*, 290 Kan. 142, 151, 225 P.3d

1177 (2010) (quoting *State v. Phillips*, 289 Kan. 28, 32, 210 P.3d 93 [2009]). The KPLA's description of a "product liability claim" with no accompanying language indicating the KPLA's effect or lack of effect on product liability common law leaves an ambiguity for this court to resolve. Examination of the KPLA's legislative history is therefore necessary.

The Kansas Legislature passed the KPLA in 1981, at least loosely basing it on the Model Uniform Product Liability Act (MUPLA) published by the Department of Commerce in 1979. See 44 Fed. Reg. 62,414-62,750 (October 31, 1979). The original proposed Senate Bill 165 was almost identical to MUPLA. But the final version of the KPLA is considerably less detailed than MUPLA in scope, definitions, and subsequent sections outlining the liability of manufacturers and product sellers.

The final version of the KPLA contains only seven sections. Section 1 is the title; Section 2 contains definitions; Section 3 covers useful safe life and the statute of repose; Section 4 addresses the defense of compliance with legislative and administrative regulatory standards existing at the time of manufacture; Section 5 concerns limitations on a manufacturer's or seller's duty to warn; Section 6 limits the liability of a seller; and Section 7 discusses circumstances in which evidence of alternative design and subsequent remedial measures is admissible or inadmissible.

MUPLA and the KPLA both state that a "product liability claim" is

"any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage, or labeling of the relevant product. It includes, but is not limited to, any action previously based on: strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or under any other substantive legal theory." 44 Fed. Reg. 62,717; K.S.A. 60-3302(c).

MUPLA further explains that the "purpose of this Act is to consolidate product liability actions that have, at times, been separated under theories of negligence, warranty, and strict liability." 44 Fed.

Reg. 62,719. Moreover, "[w]hile an argument may be made that negligence theory is qualitatively different from strict liability and, therefore, should be preserved, product liability theory and practice have merged into a single entity and can only be stabilized if there is one, and not a multiplicity of, causes of action." 44 Fed. Reg. 62,719.

MUPLA also explicitly states in its Section 3: "This Act is *in lieu of and preempts* all existing law governing matters within its coverage, including the 'Uniform Commercial Code' and similar laws; however, nothing in this Act shall prevent the recovery, under the 'Uniform Commercial Code' or similar law, of direct or consequential economic loss." (Emphasis added.) 44 Fed. Reg. 62,720. In addition:

"(C) Whenever this Act does not provide a rule of decision, reference may be made to other sources of law, provided that such reference conforms to the intent and spirit of this Act as set forth in the following criteria used as guidelines for its development:

(1) To ensure that persons injured by unreasonably unsafe products receive reasonable compensation for their injuries;

(2) To ensure the availability of affordable product liability insurance with adequate coverage to product sellers that engage in reasonably safe manufacturing practices;

(3) To place the incentive for loss prevention on the party or parties who are best able to accomplish that goal;

(4) To expedite the reparations process from the time of injury to the time the claim is paid;

(5) To minimize the sum of accident costs, prevention costs, and transaction costs; and

(6) To use language that is comparatively clear and concise." 44 Fed. Reg. 62,720.

In contrast to MUPLA, the KPLA does not contain language consolidating earlier causes of action and makes no explicit reference to whether it is "in lieu of and preempts" all other laws governing product liability. Because the KPLA borrows MUPLA language to describe a "product liability claim," one might infer that the general scope of the KPLA was intended to be the same, *i.e.*, that its seven limited sections apply to all liability claims against product sellers. See Westerbeke, *Some Observations on the Kansas Product Liability Act (Part I)*, 53 J.K.B.A. 296, 296 (1984) ("[The

KPLA's] substantive provisions apply to all 'product liability claims' against 'product sellers' for 'harm.' "). But we are reluctant to read so much into so little from our legislature.

In addition, MUPLA differs from the KPLA by laying out the "basic standards of responsibility for manufacturers" in Section 104. 44 Fed. Reg. 62,721. This section sets out the elements of the cause of action for a statutory product liability claim. The elements encompass those originally assigned to claims for strict liability for manufacturing defects, breach of express warranty, and negligent design and warning. Specifically, Section 104 explicitly states that MUPLA does not recognize a claim for strict liability for design and warning defects, relying instead on a fault basis for such claims. 44 Fed. Reg. 62,722.

MUPLA also differs from the KPLA by setting out "basic standards of responsibility for product sellers other than manufacturers" in its Section 105. 44 Fed. Reg. 62,726. A product seller is subject to liability if the claimant proves "by a preponderance of the evidence that the claimant's harm was proximately caused by such product seller's failure to use reasonable care with respect to the product." This language essentially embraces a negligence theory. 44 Fed. Reg. 62,726. Section 105 also provides that a product seller may be liable in the place of a manufacturer under Section 104 strict liability, if the manufacturer is not subject to service of process, has been judicially declared insolvent, or has been determined by the court to be judgment-proof.

Regarding the precise question before us in this case, MUPLA specifically excludes most sellers of used goods from its definition of product sellers. Its Section 102 states: "The term 'product seller' does not include: . . . (3) A commercial seller of used products who resells a product after use by a consumer or other product user, provided the used product is in essentially the same condition as when it was acquired for resale . . . ." 44 Fed. Reg. 62,717.

No such language appears in the KPLA, although the original bill excluded most sellers of used goods from the definition of "product sellers." Upon final amendment, the legislature removed the following:

"The term 'product seller' does not include:

. . . .

"(a)(3) a commercial seller of used products who resells a product after use by a consumer or other product user, provided the used product is in essentially the same condition as when it was acquired for resale . . . .

. . . .

"(b) . . . A product seller acting primarily as a wholesaler, distributor or retailer of a product may be a 'manufacturer' but only to the extent that it designs, produces, makes, fabricates, constructs or remanufactures the product before its sale." S.B. 165, 1981 Session (Kan. 1981) (as amended by House Committee of the Whole); House J. 1981, p. 753.

This removal may speak volumes. "[C]hanges made in the statute during the course of enactment may be considered by this court in determining legislative intent." *Urban Renewal Agency v. Decker*, 197 Kan. 157, 160, 415 P.2d 373 (1966). In addition, we view the legislature's inclusion of the words "for resale" in its definition of "product seller" as significant. K.S.A. 60-3302(a)'s "product seller" covers "any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor or retailer of the relevant product." It is obvious that at least some resales are sales of used products.

When it comes to setting out the responsibilities and potential liabilities of a "product seller," the KPLA is silent. This legislative approach leaves this court and other courts no choice but to look to the substantive rights and liabilities recognized under Kansas common law for each type of product liability action. See K.S.A. 77-109 (common law remains in force in aid of general statutes of state). This reality was recognized by Professor William E. Westerbeke of the University of Kansas School of Law shortly after the KPLA went into effect. He discussed whether the KPLA applied to the sale of used goods, specifically addressing whether Kansas would still employ its common law of product liability to transactions or claimants not explicitly discussed in the statute. Westerbeke, 53 J.K.B.A. at 296, 298. Westerbeke wrote:

"Once Kansas applies its product liability law to these situations, however, then the KPLA should apply . . . . [T]he KPLA is irrelevant to the question of whether

strict liability in tort should apply to . . . sales of used products." Westerbeke, 53 J.K.B.A. at 298-99.

Westerbeke also identified other issues within product liability law that were left unaddressed in the KPLA:

"Undoubtedly, numerous other issues concerning the scope and application of the KPLA will arise. A satisfactory result will usually occur if two basic points are considered. First, except for the limitations contained in the four substantive provisions in the KPLA, the question of the scope and definition of any existing theory of product liability is a matter of judicial determination unaffected by the KPLA . . . . Second, once the courts have decided the proper scope and application of any theory of product liability, then the KPLA will apply if the situation arising under that theory contains the essential characteristics of 'harm,' 'product seller,' and 'product liability claim,' as defined in section 2." 53 J.K.B.A. at 298-99.

It is also significant that two of our earlier cases are consistent with the idea that the KPLA works alongside Kansas common law rather than in place of it.

In *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 752, 861 P.2d 1299 (1993), this court stated that the purpose of the KPLA was "to limit the rights of plaintiffs to recover in product liability suits generally." And, in *Delaney v. Deere & Co.*, this court noted the purpose of the KPLA as stated in *Patton*, then said:

"In order to achieve that purpose, the KPLA contains provisions which limit in different ways the ability of a plaintiff to recover. K.S.A. 60-3303 provides that a product seller 'shall not be subject to liability' for harm caused after the 'useful safe life' of the product has expired. K.S.A. 60-3304 provides that a product is 'not defective' under certain circumstances where it was in compliance with regulatory standards when manufactured. K.S.A. 60-3306 provides that a seller 'shall not be subject to liability' under circumstances set forth." 268 Kan. at 778.

*Delaney* proceeded to rely on Kansas common law to decide a product liability question placed before this court by certification from the Tenth Circuit. This pattern of analysis demonstrated that, despite the KPLA's enactment, the Kansas common law of product liability continued to answer all questions on which the statute was less than enlightening.

Kansas federal District Court Judge John W. Lungstrum has made harmonious observations regarding the interaction between the KPLA and the common law:

"[T]here is reason to believe that the KPLA is merely a statutory mechanism that limits a manufacturer or seller's liability, and not a statute providing plaintiffs with an independent right of action. . . . [T]he purpose of the Act is to limit a plaintiff's ability to recover in a product liability suit. Moreover, the statute does not expressly provide plaintiffs with a right of action. Instead, the Act appears to presuppose the existence of a duty and then limit that duty by the terms of the statute. For example, K.S.A. § 60-3305 provides that '[i]n any product liability claim any duty on the part of the . . . seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend . . .' to various situations set forth in this section. This section does not define the duty to warn, but merely limits liability in certain circumstances. To this extent the KPLA does not pattern the Model Uniform Product Liability Act in that the latter expressly defines a manufacturer and seller's basic standards of responsibility. See 44 Fed. Reg. 62,714, 62,721-62,728 (1979)." *Cooper v. Zimmer Holdings, Inc.*, 320 F. Supp. 2d 1154, 1158 n.7 (D. Kan. 2004).

Finally, we also note that sister states with product liability statutes like the KPLA employ a blended approach—combining application of statutory and common law.

Connecticut's product liability act consolidated all claims based on negligence, strict liability, and warranty. Conn. Gen. Stat. § 52-572m(b) (2011). Thus, its Supreme Court concluded that the act became the "exclusive remedy for claims falling within its scope." *Winslow v. Lewis-Shepard, Inc.*, 212 Conn. 462, 471, 562 A.2d 517 (1989). However, because Connecticut's act did not set out requirements for any causes of action, the court also held that the purpose of the act was not to create any new substantive rights but "to eliminate the complex pleading provided at common law." *Lynn v. Haybuster Manufacturing, Inc.*, 226 Conn. 282, 292, 627 A.2d 1288 (1993); see *King v. Damiron Corp.*, 113 F.3d 93, 95 (7th Cir. 1997). The common law must still be relied upon to fill statutory gaps, specifically, to determine the substantive rights of the parties. *LaMontagne v. E.I. Du Pont De Nemours & Co., Inc.*, 41 F.3d 846, 856 (2d Cir. 1994) (analyzing Connecticut law; "Since the [product liability act] was not meant to eliminate common-law substantive rights but does not itself spell out the elements of the types of claims it consolidates, we conclude that the district court was correct to assess plaintiffs' theories of recovery in light of the . . . common-law requirements.").

In Tennessee, the legislature passed its product liability act in 1978, and much of its statute's language is similar to that in the KPLA. See Tenn. Code Ann. § 29-28-101 *et seq.* (2000). But the Tennessee law goes further, incorporating the elements from the Restatement (Second) of Torts § 402A: "A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105 (2000). In *First Nat. Bank of Louisville v. Brooks Farms*, 821 S.W. 2d 925, 931 (Tenn. 1991), the Tennessee Supreme Court determined that the state's product liability act was not "a comprehensive enactment of products liability law in Tennessee," but that it did define certain terms, including "product liability action." Tennessee, therefore, looks to its common law and its statutory adoption of the Restatement (Second) of Torts §§ 402A and 402B for the elements of a product liability cause of action.

Texas also passed its own product liability act, with language very similar to the KPLA. See Tex. Civ. Prac. & Rem. Code Ann. § 82.001 (1993). The act does not define the liabilities of manufacturers or product sellers, and Texas' caselaw indicates that the courts look to the common law for the necessary elements of product liability actions.

"Section 82.005 does not attempt to state all the elements of a product liability action for design defect. It does not, for example, define design defect or negate the common law requirement that such a defect render the product unreasonably dangerous. Additionally, the statute was not intended to, and does not, supplant the risk-utility analysis Texas has for years employed in determining whether a defectively designed product is unreasonably dangerous." *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256 (Tex. 1999).

Given all of the foregoing discussion, we conclude that the KPLA does not supersede Kansas common law on the question before us in this case. Rather, it provides only limited information, primarily in the form of reasonable inferences to be drawn from its differences from MUPLA and its specific drafting and amendment history. Kansas common law must fill in the substantial gaps we must navigate to resolve this case.

*Content of Governing Law*

Having decided that the Kansas common law of product liability retains its essential vitality on all issues not settled by passage of the KPLA, we turn to the content of the governing law, both statutory and common.

In *Brooks v. Dietz*, 218 Kan. 698, Syl. ¶ 1, 545 P.2d 1104 (1976), this court adopted the doctrine of strict liability in tort, as set out in the Restatement (Second) of Torts § 402A (1964), for the sale of a dangerously defective product. Section 402A states:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

*Brooks* is significant because the text of § 402A thus makes no distinction between sellers of used and new products.

In *Kennedy v. City of Sawyer*, 228 Kan. 439, 445-46, 618 P.2d 788 (1980), this court identified two purposes of strict liability: "a desire to achieve maximum protection for the injured party and [promotion of] the public interest in discouraging the marketing of products having defects that are a menace to the public." The *Kennedy* decision also went on to endorse what is known as a "chain of distribution" liability theory.

"Under the doctrine of strict liability the liability of a manufacturer and those in the chain of distribution extends to those individuals to whom injury from a defective product may reasonably be foreseen, and then only in those situations where the product is being used for the purpose for which it was intended or for which it is reasonably foreseeable it may be used. *Winnett v. Winnett*, 57 Ill. 2d 7, 310 N.E.2d 1 (1974); see also *West v. Caterpillar Tractor Company, Inc.*, 336 So. 2d 80, 89 (Fla. 1976); *Darryl v. Ford Motor Company*, 440 S.W.2d 630, 633 (Tex. 1969); *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 235, 552 P.2d 938 (1976)." 228 Kan. at 446.

Again, in *Kennedy*, we made no distinction between sellers of used and sellers of new products.

Both *Brooks* and *Kennedy* were decided prior to enactment of the KPLA. Shortly after enactment, this court decided *Lester v. Magic Chef, Inc.*, 230 Kan. 643, 641 P.2d 353 (1982). In that case, without discussing the KPLA, the majority specifically approved Comment i to §402A, which sets out what is known as the "consumer expectations" test for when a product qualifies as "defective." Comment i states in part:

"The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer . . . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

In dissent, Justice David Prager discussed the KPLA, arguing that adoption of a "risk-utility balancing" approach instead of a "consumer expectation" test would be more consistent with the legislative design. See *Lester*, 230 Kan. at 660-61 (Prager, J., dissenting) (citing K.S.A. 60-3304, "reasonably prudent product seller" test). A risk-utility balancing approach finds a product defective when a product is designed in a particular way and the risk or danger inherent therein outweighs the benefits. 230 Kan. at 658. Justice Prager concluded that such a balancing test would address legislative and administrative regulatory standards and provide a defense for those design defects in compliance with those standards, but his view did not prevail.

The next year, 1983, this court decided *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348 (1983), in which we stated: "[T]he plaintiff, to present a prima facie strict liability case, must produce proof of three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control."

These elements were to come to be included in the pattern instruction on strict liability. See PIK Civ. 2d 13.21 (1993 Supp.); *Siruta v. Hesston Corp.*, 232 Kan. 654, 668-69, 659 P.2d 799 (1983); PIK Civ. 4th 128.17. Both early and later pattern instruc-

tions establish three possible types of defects in strict product liability cases: "design defects," "manufacturing defects," and "warning defects." And *Mays* and *Siruta* established that, to prevail under a strict liability theory, a plaintiff must show that the product was both defective and unreasonably dangerous. In addition, *Siruta* is significant for rejecting an "open and obvious danger" rule:

"Simply because the hazard on a piece of equipment is open and obvious does not prevent it from being dangerous to the operator or consumer. The fact that the danger is patent and obvious may be an important factor in determining whether [p]laintiff's fault contributed to his [or her] own injury." *Siruta*, 232 Kan. at 664.

In *Patton*, this court decided that a warning defect case under a theory of strict liability could rest only on the time the product left the manufacturer's control. *Patton*, 253 Kan. at 755.

"This distinction reflects the emphasis in strict liability upon the danger of the product rather than the conduct of the manufacturer, *i.e.*, if a product is not rendered unreasonably dangerous by the absence of warnings when it leaves the manufacturer's control, it cannot at some later date become unreasonably dangerous due to lack of warnings." *Patton*, 253 Kan. at 755 (citing *Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045-46 [4th Cir. 1983]).

Our *Patton* decision also addressed the interaction of the KPLA with a post-sale duty to warn under a negligence theory. This court observed that K.S.A. 60-3305 did not include language regarding "the time of manufacture" and thus the KPLA did not exclude a cause of action based on a violation of a post-sale duty to warn under a negligence theory. *Patton*, 253 Kan. at 756.

Finally, in 2000's *Delaney*, 268 Kan. 769, this court analyzed the Tenth Circuit's question: Whether K.S.A. 60-3305(c) applied to a manufacturer's duty to warn or protect against hazards or only to the duty to warn, as implied by *Siruta*. K.S.A. 60-3305(c) states:

"In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend: . . . (c) to warnings, protecting against or instructing with regard to dangers, hazards, or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product."

This court held that the legislature intended K.S.A. 60-3305(c) to apply only to warnings and not to manufacturing or design defects, *i.e.*, "hazards." 268 Kan. at 777. The court found support for this holding in the goals stated in MUPLA:

"MUPLA states that its goals are to 'provide a fair balance of the interests of both product users and sellers and to eliminate existing confusion and uncertainty about their respective legal rights and obligations.' 44 Fed. Reg. at 62,716. It further states that '[t]he fulfillment of these goals should help, first, to assure that persons injured by unreasonably unsafe products will be adequately compensated for their injuries and, second, to make product liability insurance more widely available and affordable, with greater stability in rates and premiums.' 44 Fed. Reg. at 62,716. The interpretation advanced by Deere would create an imbalance and frustrate the goals of MUPLA.

"Applying K.S.A. 60-3305(c) to manufacturing and design defects is contrary to a common-sense reading of the statute and is contrary to the espoused philosophy underlying MUPLA which provided some of the rationale for the Kansas Legislature to adopt the KPLA. See *Patton*, 253 Kan. at 756[, 861 P.2d 1299]. Adopting an interpretation that would foreclose any action where a danger is open and obvious goes far beyond providing a fair balance of the interest of both product users and sellers. Rather, such an interpretation would tend to discourage product safety by allowing manufacturers and sellers to market products with open and obvious dangers to the consumer where a defect is capable of reasonable correction. We are convinced that if the legislature had meant to turn its back on the modern rule and categorically eliminate any duty on the part of the manufacturer to safeguard against open and obvious dangers, it would have done so in a more explicit manner than the language used in K.S.A. 60-3305(c)." 268 Kan. at 779.

In addition, *Delaney* considered whether Kansas should follow Comment j of the Restatement (Second) of Torts § 402A or Comment 1 of the Restatement (Third) of Torts: Products Liability § 2 (1998). In its discussion of these provisions, the court made clear that *Brooks* had adopted the main text of § 402A as Kansas law but had not necessarily adopted all of the comments to that section. The court declined to adopt "that portion of Comment j which holds that a product bearing a warning which is safe for use if the warning is followed[,] is not in a defective condition or unreasonably dangerous." 268 Kan. at 786. The court did not want to allow

"an adequate warning to absolve the manufacturer of its duty to design against dangers when a reasonably safer design could have been adopted that would have reduced or eliminated the residuum of risk that remains even after a warning is

provided. A manufacturer or seller is allowed to produce a product with an unsafe design and still escape liability through the use of a warning." 268 Kan. at 785.

The court also declined to adopt Comment l of the Restatement (Third) of Torts § 2, which states in pertinent part: "[W]hen a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks." See 268 Kan. at 793. The court based its decision on this point on Kansas' adherence to the "consumer expectations" test adopted in *Lester*, remaining convinced that "consumer expectations play a dominant role in the determination of defectiveness." 268 Kan. at 790, 793. In addition, the court rejected Comment l's mandate that proof of a feasible alternative design was required to demonstrate the existence of a design defect. Although Kansas law permits such evidence, it is not required. 268 Kan. at 791, 793; see K.S.A. 60-3307(b).

*Delaney* concluded with the following useful summary of significant product liability law in Kansas:

"[W]hether a design defect in a product exists is determined using the consumer expectations test. A [p]laintiff must show that the product is both in a defective condition and dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics. See *Lester*, 230 Kan. at 649-654. *Betts*, 236 Kan. at 115-16. Evidence of a reasonable alternative design may be introduced but is not required. *Siruta*, 232 Kan. at 667-68; *Jenkins*, 256 Kan. at 636. The fact that a hazard is open and obvious or has been warned against are factors to be considered in analyzing whether a product is defective or unreasonably dangerous. The ultimate determination remains whether the product is defective and dangerous beyond a reasonable consumer's expectations." 268 Kan. at 792-93.

All of the above discussion of the content of Kansas law demonstrates that we are not writing on a clean slate. We appreciate that, in *Sell*, 577 F. Supp. at 1399, the federal District Court of Kansas concluded that we would not apply strict liability to sellers of used goods, relying on KPLA's provisions for a "useful safe life" presumption and repose. Likewise, *Stillie*, 850 F. Supp. at 961, relied on *Sell*'s conclusion that we would not impose strict liability on sellers of used goods. But this federal interpretation ignores our

precedent and fails to acknowledge the elements we set forth for a strict liability claim in *Mays v. Ciba-Geigy Corp.*, 233 Kan. at 54. Further, *Sell* did not recognize the defense available to both new- and used-products sellers in K.S.A. 60-3306 (product seller not subject to liability if [a] seller had no knowledge of defect; [b] seller could not have discovered defect exercising reasonable care; [c] seller was not manufacturer; [d] manufacturer subject to service of process in Kansas; [e] judgment against manufacturer reasonably certain to be satisfied).

Indeed, the legislature's removal of language from the KPLA that would have differentiated between new- and used-product sellers in Kansas and our precedents adopting and applying § 402A of the Restatement, which also does not distinguish between sellers of new or used products, point to a ruling in favor of Gaumer in this case. A seller of used products is "one who sells any product," and the purchaser qualifies as "the ultimate user or consumer." § 402A(1). If the seller of the used product is "engaged in the business of selling such a product," and, assuming the used product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold," then nothing—outside of competing policy considerations and/or the persuasive force of contrary decisions from our sister state courts would appear to shield sellers of used products from the potential of strict liability in Kansas. § 402A(1), (2). We now turn to an examination of those policy considerations and those decisions from our sister state courts.

*Policy Considerations*

As discussed previously, the KPLA does not directly address public policy considerations. But Kansas has recognized several policy rationales for its broadly applicable product liability common law, including: (1) "a desire to achieve maximum protection for the injured party"; (2) promotion of "the public interest in discouraging the marketing of products that have defects that are a menace to the public," *Kennedy*, 228 Kan. at 444-46; and (3) a desire to protect consumer expectations. *Lester*, 230 Kan. 643. These policy

considerations favor extension of strict product liability to sellers of used goods.

We note that MUPLA also enumerates several policy considerations in its "Criteria for the Act":

"(1) To ensure that persons injured by unreasonably unsafe products receive reasonable compensation for their injuries . . . .

"(2) To ensure the availability of affordable product liability insurance with adequate coverage to product sellers that engage in reasonably safe manufacturing practices . . . .

"(3) To place the incentive for loss prevention on the party or parties who are best able to accomplish that goal . . . .

"(4) To expedite the reparations process from the time of injury to the time the claim is paid . . . .

"(5) To minimize the sum of accident costs, prevention costs, and transaction costs . . . .

"(6) To use language that is comparatively clear and concise." 44 Fed. Reg. 62,714-15.

Of the six MUPLA policy goals, the first clearly favors extension of, rather than restriction of liability; *i.e.*, it is plaintiff-friendly. The second is neutral in terms of plaintiff- or defendant-orientation, but it militates for clarity in the governing rules to enable potential defendants to secure adequate insurance coverage where needed. The third, given MUPLA's exclusion of most used-products sellers from liability, implies that it places the burden of loss prevention on manufacturers and sellers for new products and on purchasers and users for used products. The fourth, again, appears to speak to the need for clear and predictable rules that simplify later application, a neutral concept. The fifth appears to address incentives, some of which are designed to motivate potential plaintiffs and some, potential defendants. It also qualifies as neutral on the question before us. The sixth does not appear to address the persons or entities covered by MUPLA at all, only those responsible for drafting it.

Rossville advances two interrelated policy considerations as reasons to avoid extension of strict liability to sellers of used products: (1) The cost of used goods will increase, and therefore (2) dealers of used products will be driven out of business.

In Rossville's view, sellers of used products, often small family businesses or sole proprietorships, will be forced to forego selling "as-is" altogether for fear of future liability and high insurance costs. If not forced completely out of the used-products business, they will have to raise their prices to account for the increased risk attached to such selling. Either way, buyers are likely to seek out "as-is" products or lower priced products elsewhere. For instance, rather than buying a used piece of agricultural equipment from a dealer such as Rossville, a Kansas farmer will instead buy directly from another farmer. In the alternative, the farmer may choose to buy from a dealer in a neighboring state that has not extended strict liability to sellers of used products. Either way, Rossville reasons, at least the same number of products likely to cause injury will remain in the stream of commerce and in use in Kansas, harming both purchasers and sellers, but the rule proposed by plaintiff will offer no offsetting decrease in the social and economic cost of injuries.

Although Rossville's policy considerations appear valid, they do not account for the defense provided by K.S.A. 60-3306. As referenced above, it provides that a seller will not be liable if it can prove that it lacked knowledge of a product's defect, lacked a duty to inspect or complied with such a duty, and that the manufacturer is solvent and susceptible to jurisdiction. This statutory defense suggests no distinction between used and new sellers, and it is likely it will often be well-suited for a defendant such as Rossville, a used-products seller of farm equipment that may not know the history of an item and has no duty to inspect for defects.

At least one Missouri commentator has recognized three policy considerations other than risk reduction, *i.e.*, the idea of shifting the costs of injuries by spreading them among all consumers equally through increased prices: (1) protection of consumer expectations, (2) prevention of waste through secondhand markets, and (3) compensation of victims injured by product defects. See Mechum, *Strict Liability and Used Car Dealers After the Chrysler and General Motors Bankruptcies*, 66 J. Mo. B. 14, 17-18 (2010). We have already discussed the Kansas common-law's reliance in part on protection of consumer expectations and a desire to fully

compensate victims injured by product defects. Prevention of waste through secondhand markets refers to selling of products to dealers in used goods, thereby saving time and energy and possibly motivating a better price. 66 J. Mo. B. at 17. As Rossville suggests, imposition of strict liability could threaten the continued existence of secondhand markets "because dealers may not want to risk the tremendous and unpredictable expense." 66 J. Mo. B. at 17. In addition, compensation of the victim and deterrence of negligent and worse conduct are, of course, general goals of tort law. *Kennedy*, 228 Kan. at 445-46; Restatement (Second) of Torts § 901 (1979) (rules for determining damages based on the following purposes: "[a] to give compensation, indemnity or restitution for harms; [b] to determine rights; [c] to punish wrongdoers and deter wrongful conduct; [d] to vindicate parties and deter retaliation or violent and unlawful self-help").

Our review of the policy considerations already mentioned in Kansas caselaw and those advanced by MUPLA, Rossville, and the literature leads us to the conclusion that, not surprisingly, there are strong policy arguments on both sides of the question before us. In this situation, we are ever mindful of the usual allocation of policy making to the political branches of our government rather than this court. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 570, 232 P.3d 856 (2010) (citing *State, ex rel. Londerholm v. Columbia Pictures Corp.*, 197 Kan. 448, 455, 417 P.2d 255 [1966]). In addition, here we have some previous indication of the policy direction at least one of those branches would take. The legislature made a deliberate choice to remove language from the KPLA that would have differentiated sellers of new products from sellers of used products, and we are reluctant to deviate from its selected path. This is particularly true when that path appears to be consistent with a careful reading of our precedents. In short, policy considerations do not dissuade us from ruling that sellers of used products may be subject to strict liability in Kansas.

*Other States' Decisions*

Several courts in our sister states have considered the question before us in this case. Although decisions are split, a slight minority

favor application of strict liability to at least some sellers of used goods.

Six states have applied strict liability to nearly all sellers of used products.

The Wisconsin Supreme Court did so in the context of the sale of a used shotgun in *Nelson v. Nelson Hardware, Inc.*, 160 Wis. 2d 689, 467 N.W.2d 518 (1991). The court's rationale was Restatement (Second) of Torts § 402A itself, holding that the language of § 402A did not preclude sellers of used products as defendants; rather, its plain language applied to sellers of *any* products. 160 Wis. 2d at 702-03. The court appreciated that Comment f of § 402A might immunize sellers of used goods who were not in the business of selling; but, in the case before it, the defendant was in the business of selling both new and used goods. 160 Wis. 2d at 703. Its holding was specific and tailored to § 402A: Strict liability claims may be maintained against sellers of used goods when the defective condition causing harm to the consumer of a used product arises out of original manufacturing processes and when the seller of the used product is in the business of selling such products. 160 Wis. 2d at 707-08.

In *Jordan v. Sunnyslope App. Prop. & Plumbing*, 135 Ariz. 309, 314, 660 P.2d 1236 (Ct. App. 1983), the Arizona Court of Appeals also interpreted the Restatement (Second) of Torts § 402A to permit strict liability claims against a used-goods seller. The court relied upon the fact that Arizona product liability law required plaintiffs suing under a strict liability theory to prove that a product was unreasonably dangerous. 135 Ariz. at 314. This requirement guarded against sellers becoming insurers of the products they sold. 135 Ariz. at 314.

One Connecticut court also has directly addressed the question of applying strict liability to sellers of used goods. In *Stanton v. Carlson Sales, Inc.*, 45 Conn. Supp. 531, 535, 728 A.2d 534 (1998), a trial-level court held that strict liability applied to sellers of used goods:

"This analysis is confirmed, at least to some extent, by the text of the Act itself. General Statutes § 52-572n(a) provides that, 'A product liability claim . . . may be asserted and shall be *in lieu of* all other claims against product sellers, including

actions of negligence, strict liability and warranty, for harm caused by a product.' 'Product seller' is a term of art. It is defined by General Statutes § 52-572m(a) as 'any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption.' The statutory text does not distinguish between sellers of new and used products. The Act contains no language limiting its application to cases involving design or manufacturing defects in new products. As the Minnesota Court of Appeals observed in an analogous case, 'If the legislature had wanted to place these restrictions on the law, it could have done so.' *Gorath v. Rockwell International, Inc.*, 441 N.W.2d 128, 132 (Minn.App.1989)." (Emphasis added.) 45 Conn. Supp. at 535.

Unlike the KPLA, the Connecticut act includes a provision stating explicitly that a product liability claim may be asserted against "product sellers." See Conn. Gen. Stat. § 52-572n (2011) ("A product liability claim as provided in sections 52-240a, 52-240b, 52-572m to 52-572q, inclusive, and 52-577a may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product.").

New Jersey is the fourth state in which strict liability has been applied to sellers of used goods. One of its superior courts relied in part on economic theory, stating:

"An economic analysis of enterprise liability, which includes direct as well as indirect costs, would charge those in the business of selling a defective product with responsibility for all harms, physical and economic, which result from its use. [Citation omitted.] To a considerable extent—with respect to new goods—the manufacturer bases the cost of his product on his expenses, which include damages caused by the product and insurance to cover those damages. This cost is spread among all the customers for that product; it reflects the justifiable expectations of customers regarding safety, quality and durability of new goods. Sellers of used goods may similarly distribute their costs of doing business which, in turn, will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods.

"[R]ealistic expectations of quality and durability will be lower for used goods, commensurate with their age, appearance and price. However, safety of the general public demands that when a used motor vehicle, for example, is sold for use as a serviceable motor vehicle (and not as junk parts), absent special circumstances, the seller be responsible for safety defects whether known or unknown at time of sale, present while the machine was under his control. Otherwise, the buyer and the general public are bearing the enterprise liability stemming from introduction of the dangerously defective used vehicle onto the public highways.

. . ." *Turner v. International Harvester Company*, 133 N.J. Super. 277, 288-89, 336 A.2d 62 (1975).

In *Ortiz v. Farrell Co.*, 171 N.J. Super. 109, 114, 407 A.2d 1290 (N.J. Super. 1979), another New Jersey superior court determined that, under New Jersey common law, strict liability should be applied to sellers of used goods. It relied on two prior cases, holding that "it [wa]s not necessary to show that a defendant created a defect, but only that the defect existed when the product was distributed by and under a defendant's control. Vendors of used products may also be held to strict liability account." 171 N.J. Super. at 115.

The Texas Court of Appeals also has relied on § 402A of the Restatement (Second) of Torts to extend strict liability to sellers of used products. In *Hovenden v. Tenbush*, 529 S.W.2d 302, 306 (Tex. 1975), it held:

"We find nothing in Sec. 402A, or in the accompanying comments, which suggests that the rule there announced is not applicable to dealers in used products. The liability is imposed on the seller of 'any product.' Neither the rule nor the commentary contains any language which can fairly be interpreted as making the rule applicable only to sellers of new products."

The Washington Court of Appeals has done likewise. In *Thompson v. Rockford Machine*, 49 Wash. App. 482, 488, 744 P.2d 357 (1987), it stated:

"The paramount policy to be promoted by the rules of strict liability is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them. The theoretical foundation of strict liability is that manufacturers who place their products in the stream of commerce impliedly represent their goods as safe for intended use. [Citations omitted.] These objectives are furthered by holding a dealer of used products strictly liable. Nothing in section 402A requires the seller to be in the 'initial' chain of distribution, and there is no justification for finding that dealers of used goods as a class cannot shift losses, distribute costs, or insure against losses. Thus, we hold that section 402A applies to a dealer of used products."

In addition to Wisconsin, Arizona, Connecticut, New Jersey, Texas, and Washington, courts in three other states have been willing to apply strict liability to sellers of used products when the product in issue has been remanufactured or repaired.

The Supreme Court of South Dakota extended strict liability to a seller who rebuilt and then sold a used product in *Crandell v. Larkin and Jones Appliance Co.*, 334 N.W.2d 31 (S.D. 1983). The primary justification for the extension was protection of the expectations of consumers of remanufactured used products. The court first concluded that it was possible to have a breach of the warranty of merchantability with respect to used goods. If so, the court reasoned, strict liability also would be appropriate if the product at issue were unreasonably dangerous. 334 N.W.2d at 34.

Distinguishing this South Dakota precedent, the Eighth Circuit held that strict liability would not apply under that state's law to a seller of a used commercial clothes drying machine, sold "as-is," with no remanufacture or repair prior to sale. *Wynia v. Richard-Ewing Equipment Co. Inc.*, 17 F.3d 1084 (8th Cir. 1994). The court interpreted a provision of South Dakota's product liability act to inject a negligence element into any claim of strict liability against a seller. The South Dakota statute, unlike the KPLA, prohibits strict liability claims against "any distributor, wholesaler, dealer or retail seller" for latent defects, unless the plaintiff can show that the defendant "knew, or, in the exercise of ordinary care, should have known of the defective condition of the final product." 17 F.3d at 1088-89 (citing *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 915 [S.D. 1987]).

The Supreme Court of Alaska also has applied strict liability selectively, allowing the claim against a seller of a used diesel generator when a third-party repair company remanufactured the generator at seller's instruction prior to sale. *Kodiak Elec. Ass'n v. DeLaval Turbine, Inc.*, 694 P.2d 150, 153 (Alaska 1985). The court declined to allow strict liability against the repair company. 694 P.2d at 154 (citing *Swenson Trucking & Excavating, Inc. v. Truckweld Equipment Co.*, 604 P.2d 1113, 1117 [Alaska 1980]).

The California Court of Appeals also recently held that a seller of used goods could not be strictly liable for defects unless it had rebuilt or reconditioned the product before sale. *Arriaga v. CitiCapital Commercial Corp.*, 167 Cal. App. 4th 1527, 1540, 85 Cal. Rptr. 3d 143 (2008). The court stated that the used-goods

seller who rebuilds or remanufactures a product steps into the shoes of the manufacturer.

"Although the retailer of a product may play a substantial part in ensuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end, this risk reduction rationale is inapplicable to a used goods dealer. [Citation omitted.] The used goods dealer is normally entirely outside the original chain of distribution of the product. [Citation omitted.] To impose such liability would, as a practical matter, require all dealers in used goods routinely to dismantle, inspect for latent defects, and repair or recondition their products, thus effecting a radical change in the nature of the used product market." 167 Cal. App. 4th at 1540.

Minnesota also resides in the category of states with limited application of strict liability to sellers of used goods. According to its Court of Appeals, instead of liability rising and falling on remanufacture or repair, it depends on proof that the seller had knowledge of the defect. See *Gorath v. Rockwell Intern., Inc.*, 441 N.W.2d 128, 132 (Minn. Ct. App. 1989) (used paper cutter; statutory defense makes it difficult for plaintiff to recover from used seller). In addition, the Minnesota court held that strict liability against a used-goods seller was justified only when the salesperson was more than a passive middleman and had some involvement with the condition of the product. 441 N.W.2d at 132.

Five states have decisions generally rejecting strict liability against sellers of used products. Another, New York, rejected application of strict liability against a used-goods seller in a particular case, but it did not categorically reject its application to sellers of used products. See *Jaramillo v. Weyerhaeuser Co.*, 12 N.Y.3d 181, 192-93, 878 N.Y.S. 2d 659, 906 N.E.2d 387 (2009).

The Oregon Supreme Court's opinion in *Tillman v. Vance Equipment Company*, 286 Or. 747, 596 P.2d 1299 (1979), dealt with defects in a 24-year-old crane sold "as-is" by the defendant, a used equipment dealer, to the plaintiff's employer. 286 Or. at 749. To determine whether strict liability should extend to sellers of used products, the Oregon Supreme Court reassessed its rationale for adopting strict liability in the first place, holding compensation of victims might justify extending strict liability to used dealers. 286 Or. at 754. The court determined that, in the context

of used equipment sales, a reasonable buyer knows that the seller makes no representation of the quality of the product simply by placing the product on the market. 286 Or. at 755. Further, a used-goods dealer is normally outside the chain of distribution of the product, with no direct relationship to the manufacturer and lacking a ready channel of communication to exchange information about dangerous defects. 286 Or. at 756. Given the low value of many transactions in the used-goods market, the court held that, in the absence of some representation of quality beyond the sale itself or of a special relationship between the used-goods dealer and the manufacturer, strict liability should not apply to the seller of used goods. 286 Or. at 757.

Other jurisdictions that have generally rejected an extension of strict liability to used-goods sellers have followed a rationale similar to that of the Oregon Supreme Court. See *Allenberg v. Bentley Hedges Travel*, 22 P.3d 223, 230 (Okla. 2001) (following *Tillman*, concluding that "as-is" used sales, when reasonable consumer has lower expectations and seller has no close relationship with the manufacturer, may not trigger strict liability); *Peterson v. Idaho First Nat. Bank*, 117 Idaho 724, 791 P.2d 1303 (1990) (rejecting public safety arguments, holding buyer of used goods does not expect either express or implied representations of quality); *Grimes v. Axtell Ford Lincoln-Mercury*, 403 N.W.2d 781 (Iowa 1987) (declining to apply strict liability to used car dealer when defect was not discoverable even with reasonable inspection); *Brigham v. Hudson Motors, Inc.*, 118 N.H. 590, 392 A.2d 130 (1978) (declining to apply strict liability to used car dealer); *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill. 2d 17, 329 N.E.2d 785 (Ill. 1975) (declined to extend strict liability to used car dealer, even when dealer might have discovered defect that led to injury); *cf. Jaramillo*, 12 N.Y.3d at 192-93 (burden of strict liability onerous, should be imposed only on manufacturers, sellers with relationship to manufacturer; imposition of strict liability on other used-products seller not foreclosed).

We believe the weight of the most persuasive precedent from our sister states reinforces our preliminary conclusion that strict liability should be available in Kansas against a seller of a used

product. See *Powell*, 290 Kan. at 570. Given the plain language of the KPLA and its intersection with our precedent adopting Restatement (Second) of Torts § 402A, application of strict liability against a seller of used products appears to be consonant with previously declared and implied policy. We also note that the defense provided both new and used product sellers under K.S.A. 60-3306 should prevent the sky from falling on potential defendants.

*Conclusion*

Kansas law permits pursuit of a strict liability action against the seller of a used product. The decision of the district court is therefore reversed. The Court of Appeals is affirmed. The case is remanded to the district court for further proceedings consistent with this opinion.

DAVIS, C.J., not participating.
MICHAEL F. POWERS, District Judge, assigned.